```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
2                      DAVENPORT DIVISION

3

4       UNITED STATES OF AMERICA, )
                                  )
5            Plaintiff,           )
                                  )
6         vs.                     ) NO. 98-242
                                  )
7       EUKA WADLINGTON,          )
                                  )       ORIGINAL
8            Defendant.           )

9

10                      United States Courthouse
                        Davenport, Iowa  52801
11

12

13      Hearing commenced at 10:18 a.m., February 12,
        1999.
14

15

        BEFORE:  Thomas J. Shields, Federal Magistrate
16

17

18

19

        REPORTER:  Beverly K. Bleigh (via tape recording)
20                 Certified Shorthand Reporter
                   Bettendorf, Iowa  52722
21

22

23

24

25
```

# INDEX

## Witness

### SEAN McCLELLAN

| Examination | D | C | RD | RC |
|---|---|---|---|---|
| Mr. Cronk ............. | 14 | | 25 | |
| Mr. Goodman .......... | | 18 | | 26 |

### LAURA TAGUE

| Examination | D | C | RD | RC |
|---|---|---|---|---|
| Mr. Cronk ............. | 32 | | 35 | |
| Mr. Goodman .......... | | 34 | | 35 |

### HEATHER KLINE

| Examination | D | C | RD | RC |
|---|---|---|---|---|
| Mr. Cronk ............. | 36 | | 48 55 | |
| Mr. Goodman .......... | | 41 | | 51 55 |

### RON HEEREN

| Examination | D | C | RD | RC |
|---|---|---|---|---|
| Mr. Cronk ............. | 56 | | 69 | |
| Mr. Goodman .......... | | 59 | | 70 |

### ARTHUR SAMMY WALKER

| Examination | D | C | RD | RC |
|---|---|---|---|---|
| Mr. Cronk ............. | 73 | | | |
| Mr. Goodman .......... | | 78 | | |

## EXHIBITS

| Exhibit | Marked | Offered |
|---|---|---|
| (None offered.) | -- | -- |
| Certificate of Court Reporter ........ 117 | | |

1    **F E B R U A R Y   1 2 ,   1 9 9 9**

2             THE COURT:  So we're ready to

3    proceed with the Government's Motion to Revoke

4    Pretrial Release.  Mr. Cronk, you may proceed.

5             MR. CRONK:  Your Honor, first of

6    all, I would ask that any witnesses that are

7    appearing here, other than Agent Dasso and Mr.

8    Wadlington, obviously, if he's going to testify,

9    be excluded from the courtroom.  I'm asking for an

10   order sequestering witnesses.

11            THE COURT:  I will --

12            MR. GOODMAN:  I have no objection to

13   that.

14            THE COURT:  The Court will grant the

15   motion excluding witnesses.  Anyone here in the

16   courtroom who would be called as a witness or

17   knows that they will be called as a witness will

18   be required to leave the courtroom and remain

19   outside until summoned.

20            MR. CRONK:  Your Honor, secondly, I

21   would like the Court to be aware we did a record

22   check this morning and found that there is an

23   active warrant for the arrest of Mr. Wadlington

24   out of Harvey, Illinois.  The warrant was issued

25   on December 8th, 1998.  I don't believe pretrial

1    services was aware of this.  I provided a copy of

2    the arrest warrant to Mr. Goodman.

3              THE COURT:  What's the nature of it;

4    do you know?

5              MR. GOODMAN:  I believe it's traffic

6    offenses, Your Honor.  That's what I was informed

7    by the Agent.  Do you know?  It's for traffic

8    offenses, and Mr. Wadlington will take care of

9    that, of course, assuming he is allowed to go home

10   today.

11             MR. CRONK:  Your Honor, I would like

12   to give you an outline of what I expect the

13   Government to show today.

14             THE COURT:  By nature of opening

15   statement?

16             MR. CRONK:  Yes, Your Honor.

17             THE COURT:  Albeit briefly.

18             MR. CRONK:  First of all, Your

19   Honor, I have arranged with Mr. Goodman that the

20   pretrial services person from Chicago, named Sean

21   J. McClellan, is available by telephone this

22   morning in his office to testify by phone.

23   Mr. Goodman indicated to me he had no objection to

24   that.

25             I also intend to call a Sammy

1    Walker, who was approached -- I believe will

2    testify he was approached by Mr. Wadlington on the

3    date that Mr. Wadlington was supposed to be here

4    for arraignment, that would be December 10th of

5    1998.  The Court will recall on that date that

6    Mr. Wadlington didn't make it to court on time and

7    his excuse was he got lost on his way here.  I

8    believe the evidence will establish that that's

9    not what happened, that he wasn't lost or if he

10   was lost, it was because he got a late start after

11   he was looking for Mark Thomas, a Government

12   witness, in Clinton or speaking with Mr. Walker

13   about Mark Thomas in Clinton.

14              The Government will also put on

15   Kelli Sieck, who is a hostess at the Country

16   Kitchen in Clinton, Iowa, and she will testify on

17   the afternoon of January 29th, several individuals

18   came in together ordering large amounts of food

19   from Country Kitchen asking for carryout, or

20   asking for that stuff to be carried out of the

21   restaurant, and in that time they used a cellular

22   phone and one individual used a pay phone.

23              During that time period, Your Honor,

24   Mr. Wadlington contacted, by the pay telephone at

25   the Country Kitchen, a Heather Kline, or attempted

1  to contact Heather Kline, another Government

2  witness, who also is the mother of one of

3  Mr. Wadlington's children, and a Laura Tague,

4  Heather Kline's mother, took a phone call from

5  Mr. Wadlington and he asked for Heather Kline at

6  that time.

7  I am going to ask the Court to note

8  that on Friday afternoon, January 29th, Judge

9  Wolle directed -- and I don't believe there is any

10  dispute about that -- directed Mr. Wadlington to

11  not have any contact with any witnesses during his

12  release, and Heather Kline was, in fact, a

13  Government witness at that time.

14  The Government will also call as a

15  witness Agent Dasso and Officer Bill Greenwald.

16  We would expect their testimony to establish, and

17  other police officers' testimony to establish,

18  that upon learning of the caller ID phone number

19  on Mrs. Teague's line when she called the police,

20  they determined that that phone was the phone at

21  the Country Kitchen.

22  They went to Country Kitchen, they

23  then started canvassing Clinton, looking for

24  Mr. Wadlington.  They found Mr. Wadlington at the

25  Best Western motel in Clinton and while there,

1    they observed Mr. Wadlington in the -- with a

2    large group of people.  He had checked into room

3    400.  He and his associates had racked up a large

4    bar bill, movies and long distance phone calls to

5    a room there.  They were socializing with females,

6    and Mr. Goodman was not with them.

7                     This persisted from about 10 o'clock

8    to about midnight, at which time Agent Dasso

9    believes Mr. Wadlington was informed the police

10   were there, that Mr. Wadlington quickly, with his

11   associates, packed up their belongings, got into

12   two separate cars and began to drive out of

13   Clinton.

14                     Mr. Bill Greenwald, an inspector

15   with the Illinois State Police, and a police

16   officer with the Clinton Police Department tracked

17   the vehicles as they left the area.  They were

18   going at a high rate of speed.  Agent Greenwald

19   was able to stop Mr. Wadlington's vehicle, and at

20   that time, Mr. Wadlington was removed from the

21   vehicle, gave consent to search the vehicle.

22                     Inside one of the bags in the

23   vehicle was property stolen from the Best Western

24   motel.  Mr. Wadlington was not authorized to

25   drive.  He was driving a leased vehicle.

1          And the Government will also put on

2    that during roughly from 3 -- well, the hearing on

3    Friday afternoon ended at about 2:15, January

4    29th.  At that time, Mr. Goodman indicated he

5    would be at the U.S. Attorney's Office by 2:45.

6    He arranged to meet with me and look at the

7    Government file at that time.  At 3:30 or

8    thereabouts, he showed up at the U.S. Attorney's

9    Office and from 3:30 until 6:25 he was at the U.S.

10   Attorney's Office without Mr. Wadlington.  So for

11   at least a three-, four-hour period of time,

12   Mr. Wadlington was unaccompanied by Mr. Goodman.

13          I would also ask -- and you will

14   hear from Sean McClellan, even though he was

15   advised that Mr. Wadlington, in a message left by

16   Mr. Goodman, that Mr. Wadlington was traveling to

17   Clinton, Mr. McClellan thought that he was

18   traveling to Clinton with Mr. Goodman and would be

19   accompanied by Mr. Goodman the entire time they

20   were there and the purpose for this trip was to

21   look at Clinton and drive around and see things,

22   and that it was not his understanding that

23   Mr. Wadlington would be unaccompanied by his

24   attorney or that he would be there with a group of

25   people or that he would check into a hotel or that

1    he would have drinks or that he would otherwise be

2    with anyone other than Mr. Goodman.

3                    That's what I expect to show today.

4                    THE COURT: (Inaudible.)

5                    MR. CRONK: I don't believe so. I

6    don't know. So I first ask the court clerk to

7    contact -- well.

8                    THE COURT: Mr. Goodman, do you wish

9    to make any statement at this time?

10                   MR. GOODMAN: Your Honor, I guess I

11   would like to make a brief reply.

12                   Mr. Wadlington -- as I see it,

13   there's three allegations. I believe one is that

14   he has attempted to contact witnesses, and I just

15   would point out that Mr. Wadlington -- the

16   Government has never complied with our request to

17   furnish a witness list, so he has absolutely no

18   idea who the witnesses are, and up until I had a

19   few hours to look through the Government file, all

20   Mr. Wadlington knew was that he was charged with

21   drug offenses and that there were people in

22   federal custody who were going to testify against

23   him and say they bought drugs from him. He knows

24   that all those people are cooperating and have

25   been offered deals if they would testify against

1    him.  Doesn't know who they are, doesn't know what

2    they are going to say.  Apparently there are some

3    witnesses who are not in custody who are going to

4    testify.  He does not know who they are.  It's

5    impossible for him to contact witnesses if he

6    doesn't know who they are.

7              Mr. Wadlington -- I would suggest

8    that if any of us was facing life in prison and we

9    didn't know who was going to say what about us, we

10   would be somewhat curious.  We might pick up a

11   phone and say, "Hey, what's up?"  Mr. Wadlington

12   lived in Clinton, he knows a lot of people in

13   Clinton.  I don't think that's a violation of his

14   bond.

15             Second, the fact that he had a meal

16   at Country Kitchen and made a phone call, I think

17   the evidence will show that the woman that he

18   tried to contact is a former girlfriend, who

19   actually has a child by Mr. Wadlington.  That

20   phone call was not for the purpose of harassment.

21   He certainly had no information she was going to

22   be a witness against him or that she had been

23   contacted by the police.

24             I also believe that the evidence

25   will also show that the officers did not just

1    happen to find Mr. Wadlington at the Best Western.

2    In fact, they had been following him around the

3    entire afternoon, and the evidence will also show

4    that the stolen property was not stolen by

5    Mr. Wadlington. He had no knowledge of it, and

6    certainly if he had known about it, he would not

7    have allowed that to take place, certainly while

8    he's on bond and strict electronic monitoring

9    conditions. I believe the evidence will show

10   these allegations are without merit.

11             THE COURT: I want to make some

12   observations (inaudible). I want to make sure we

13   don't get bogged down (inaudible). I would

14   appreciate a conciseness in the evidence. I am

15   not really interested in the details of meals or

16   the allegations maybe of socializing, if you will.

17   I understand there may be evidence of that.

18             I'm looking right now at an order

19   setting conditions originally entered by

20   Magistrate Judge Morton Denlow, Northern District

21   of Illinois, and in that, under paragraph 7, it

22   specifically states that under 7C., "The defendant

23   would abide by the following restrictions of his

24   personal associations, place of abode, or travel:

25   not leave Northern District of Illinois, except to

1    attend court business in Davenport, Iowa, stay in

2    home under electric monitors, except to travel to

3    work or attend church."  My copy is not very good.

4    So in the context of that, I understand the

5    necessity to (inaudible) some foundation, but I'm

6    not interested in a detailed explanation of what

7    was served, what was eaten, whatever else was

8    going on.  The bond speaks for itself.

9               Now, let me also offer this other

10   observation, and I would like to hear about that,

11   because Mr. Goodman, perhaps, will argue that

12   (inaudible) Mr. Cronk mentioned (inaudible)

13   contact witnesses.  I understand the explanation

14   of Mr. Goodman regarding the list of witnesses;

15   however, I want to hear the evidence as to what

16   Judge Wolle specifically ordered on that date,

17   because obviously if Judge Wolle entered that

18   order, it certainly is incumbent upon you to

19   determine if your client can comply by finding out

20   who the witnesses are, so I am curious and I am

21   interested in the scenario that surrounds the

22   issue of the order by Judge Wolle and disclosure

23   of witnesses who he ordered, when they were

24   disclosed.

25               So given those comments and response

13

1    to opening statement, Mr. Cronk.

2                      MR. GOODMAN:  May I make one

3    comment, Your Honor, regarding the conditions of

4    release, because I believe it's unclear, at least

5    on my copy it's unclear, but it was

6    specifically -- there is a specific exception that

7    was written in in the margin that he is allowed to

8    visit his attorney, and I believe in the very far

9    right margin, that was added on, and Mr.

10   Wadlington has made several visits with the

11   knowledge of his pretrial officer, Sean McClellan,

12   to my office to meet with me to work on the case.

13                      THE COURT:  And I appreciate that

14   comment, Mr. Goodman.  But all I can say is,

15   first, that doesn't appear on my copy, but I'm not

16   saying it's not there.  In that regard, my

17   understanding is your office is in Cook County.

18                      MR. GOODMAN:  That's correct, in

19   Chicago.

20                      THE COURT:  You may call your first

21   witness.

22                      MR. CRONK:  We would ask the Court

23   to contact Sean McClellan at area code 312,

24   435-5793.

25                      (The phone call was placed off the

1    record.)

2              THE COURT:  I would, at this time,

3    ask the Deputy Clerk to swear in Mr. McClellan.

4                    **SEAN McCLELLAN,**

5      called as a witness on behalf of the

6      Government, being first duly sworn, was

7      examined and testified as follows:

8              THE COURT:  You may proceed,

9      Mr. Cronk.

10                   **DIRECT EXAMINATION**

11   **BY MR. CRONK:**

12        Q.   Would you state your name and spell the

13   first and last names.

14        A.   Sean McClellan, S-E-A-N,

15   M-C-C-L-E-L-L-A-N.

16        Q.   Can you tell us your occupation, sir?

17        A.   Pretrial Services Officer for the

18   Northern District of Illinois.

19        Q.   Are you familiar with Euka Wadlington?

20        A.   Yes, I am.

21        Q.   Is he someone under your supervision

22   while on pretrial release?

23        A.   Yes.

24        Q.   Are you familiar with the conditions of

25   his release?

1      A.   Yes.

2      Q.   Does he have travel restrictions?

3      A.   Yes.

4      Q.   Could you tell the Court whether you

5  discussed those restrictions with Mr. Wadlington?

6      A.   Yes, I have.

7      Q.   What are those restrictions?

8      A.   (Inaudible) is that he is restricted to

9  the Northern District of Illinois and Davenport,

10  Iowa.

11      Q.   Can he go to Davenport anytime he wants

12  to?

13      A.   No, only for court purposes.

14      Q.   Do those travel restrictions include

15  Clinton, Iowa?

16      A.   No.  It doesn't say Clinton, Iowa,

17  anywhere in here.

18      Q.   Are you comfortable Mr. Wadlington was

19  aware of those restrictions?

20      A.   Yes.

21      Q.   Can you tell us, did there come a time

22  recently, prior to January 29th of 1999, that you

23  had discussions with Mr. Wadlington about his

24  desire to travel to Clinton?

25      A.   No, none.

1    Q.   Did you receive a message from anyone

2    asking or indicating that Mr. Wadlington would be

3    traveling to Clinton?

4        A.   Yes, I did.

5        Q.   Can you tell us about that message?

6        A.   On January 28th, 1999, I received a

7    voice mail message from Defendant's attorney

8    indicating that the Defendant will be in court in

9    Davenport and will also be going to Clinton, Iowa,

10   as he had a court matter there, and that his

11   attorney (inaudible) show him around in Clinton.

12       Q.   He told you Mr. Wadlington had a court

13   matter in Clinton?

14       A.   Yes.

15       Q.   Did you indicate to Mr. Goodman or

16   Mr. Wadlington that that trip was approved?

17       A.   No, I didn't.  (Inaudible) in the field

18   and I didn't retrieve the message until the

19   morning of January 30th.

20       Q.   Can you tell us, was Mr. Wadlington on

21   electronic monitors at the time you were in the

22   field?

23       A.   Yes, he was.

24       Q.   Did you determine whether or not he left

25   the area based on your electronic monitoring

1    equipment?

2         A.    Yes, I did.

3         Q.    What time did he leave the area?

4         A.    Yes, he did leave the area.

5         Q.    When did he leave the area, if you can

6    tell us?

7         A.    Mr. Wadlington left -- let's see.

8    January 29th at 3:12 in the morning.

9         Q.    When did he return?

10        A.    He returned -- let's see.  That would be

11   January 30th at 5:07 a.m.

12        Q.    When you noticed that, did you think

13   Mr. Wadlington was in violation of his conditions

14   of release?

15             MR. GOODMAN:  Objection.

16        A.    I knew that something had occurred.

17             THE COURT:  I'll overrule the

18   objection.

19        A.    When I received my voice mail message is

20   (inaudible) that he was stopped by the police and

21   that he was delayed in coming back and I received

22   a voice mail message from his attorney as well,

23   advising him that the Defendant had told

24   Mr. Goodman he had been stopped by the police and

25   had gotten in at (inaudible).

1    Q.   What was your understanding from

2    discussing this with Mr. Wadlington whether or not

3    he had been with his attorney the entire time?

4        A.   Yes.   (Inaudible).

5        Q.   How did you reach that understanding he

6    was with Counsel the whole time?

7        A.   In that when I spoke to Mr. Wadlington

8    that morning, he indicated that (inaudible)

9    attorney to do some things (inaudible) Davenport

10   and the matter had been in Clinton.

11           When I spoke to Mr. Goodman -- let's see

12   here.   That would have been on the 1st of

13   February -- he advised me what had occurred, and

14   he let me know he wasn't aware -- that the trip

15   wasn't going to be Clinton (inaudible) quite a

16   while and had left him later Wednesday night.

17           MR. CRONK:   I have no other

18   questions.

19           THE COURT:   Mr. Goodman,

20   (inaudible).

21                    **CROSS-EXAMINATION**

22   **BY MR. GOODMAN:**

23       Q.   Mr. McClellan, this is Mr. Goodman, the

24   attorney for Euka Wadlington.

25       A.   Hello.

1     Q.   I have spoken with you several times

2   about Mr. Wadlington's bond.

3     A.   Yes.

4     Q.   Now, you referred to a message that I

5   left on your machine.

6     A.   Yes.

7     Q.   On January 28th.

8     A.   That message was on the 30th.  That

9   morning, January 30th.  (Inaudible) 28th was that

10   you indicated the Defendant was going to court.

11     Q.   I'm referring to the first message on

12   the 28th, right?

13     A.   Yes.

14     Q.   But you didn't receive it until the

15   30th?

16     A.   Right.

17     Q.   You're paraphrasing your recollection of

18   that message?

19     A.   Yes.

20     Q.   You didn't save it?

21     A.   No.

22     Q.   You didn't transcribe it?

23     A.   No.

24     Q.   You said that I informed you that

25   Mr. Wadlington had court in Davenport, Iowa, was

1    not required to attend, but wanted to attend.   Do

2    you recall that message?

3         A.   Yes.

4         Q.   I also told you that because the case

5    (inaudible) scene of the alleged crime was

6    Clinton, Iowa, that I had asked Mr. Wadlington to

7    show me around the town of Clinton, Iowa, and show

8    me some relevant places.  Do you recall me leaving

9    that on the message?

10        A.   That's correct.

11        Q.   I did not tell you that he had to go to

12   court in Clinton, Iowa, did I?

13        A.   No -- I recall (inaudible) because

14   (inaudible) Mr. Wadlington lead you to some area

15   you needed to know about in regard to the matter.

16        Q.   But I never told you he had to go to

17   Clinton for court, did I?

18        A.   No.

19        Q.   I told you he had to go to Davenport to

20   court?

21        A.   Yes (inaudible).

22        Q.   Now, you said you had spoken to Euka

23   about this matter at some point?

24        A.   Yes.

25        Q.   Was that on the (inaudible) you spoke to

1    him?  When was the first time you spoke to him

2    about going to Clinton?

3        A.    (Inaudible).

4        Q.    When was it you spoke to him?

5        A.    He was at home.

6        Q.    After he returned?

7        A.    Yes.

8        Q.    So that's the first time you spoke to

9    him about going to Clinton?

10       A.    Right.

11       Q.    He hadn't talked to you about going on

12   the trip?

13       A.    I don't recall.

14       Q.    He may have mentioned (inaudible) going

15   to Davenport and wanted to go to Clinton?

16       A.    I didn't get a message about that.

17       Q.    Did you get a copy of that conversation

18   with Euka (inaudible)?

19       A.    I have no knowledge of prior to going.

20   The only thing I know is he called and left a

21   message that he had court and said I will notify

22   (inaudible) went to court.

23       Q.    When was the last time you spoke with

24   Euka prior to this trip to Davenport?

25       A.    Let's see here.  That would have been on

1    the 25th of January.

2        Q.   On that time, you don't recall him

3    mentioning he had to go to court on the 29th or

4    the 30th?

5        A.   Yes, yes.  Mr. Wadlington indicated he

6    had court Friday.

7        Q.   Did he talk about going to court?

8        A.   Yes.  He said he had court Friday.

9        Q.   Was anything else involved with that

10    phone call?

11        A.   No (inaudible).

12        Q.   (Inaudible) I'm sorry.

13        Now, Mr. McClellan, Mr. Wadlington is

14    allowed to visit his attorney; is that correct?

15        A.   Yes.

16        Q.   That's one of the exceptions to the

17    restrictions of bond; is that correct?

18        A.   Yes.

19        Q.   And (inaudible) requirement (inaudible)

20    be at the attorney's office?

21        A.   No.

22        Q.   Is it your experience -- is it

23    (inaudible) visit the scene of a crime with your

24    client?  Do you know of other attorneys who want

25    to do that?

1          A.   Yes.

2          Q.   Euka's restrictions are for work,

3     church, court or visit his attorney; is that

4     correct?

5          A.   Yes.

6          Q.   And you've been monitoring him; is that

7     correct?

8          A.   Yes.

9          Q.   Has he -- are you aware if he's working?

10         A.   Yes.

11         Q.   Do you know the name of his employer?

12         A.   Mr. Gregory Jackson.

13         Q.   Have you met Mr. Jackson?

14         A.   Gregory Jackson.

15         Q.   You have met Mr. Jackson, haven't you?

16         A.   Yes, I have.

17         Q.   And you talk about the work he's been

18    doing?

19         A.   Yes.

20         Q.   And he's doing the work of (inaudible)

21    rebuilding porches or decks or something?

22         A.   At different locations in Chicago.

23         Q.   He works pretty long hours; is that

24    correct?

25         A.   Yes, he does.

1    Q.    And he's earning money for his family

2    doing that; is that correct?

3    A.    Yes.

4    Q.    When he says he's going to work, he does

5    go to work (inaudible).

6    MR. CRONK:  Your Honor, all of this

7    is irrelevant.

8    A.    (Inaudible) understanding that he

9    (inaudible).

10    THE COURT:  I'll overrule the

11    objection.

12    Q.    (BY MR. GOODMAN)  Has he ever told you

13    he's going to see his attorney?

14    A.    Yes.

15    Q.    (Inaudible) goes to see his attorney?

16    A.    Yes, I do.

17    Q.    Is it true also that he has a case

18    pending in Clinton, Iowa?

19    A.    Yes, it is.

20    Q.    Do you know the nature of those charges?

21    A.    No, I don't.

22    Q.    And he, in fact, prior to this bond, he

23    has had to go to Clinton, Iowa, to attend required

24    court appearances there; isn't that correct?

25    A.    Yes.

1    Q.   So he is allowed to go to Clinton to go

2    to court; is that correct?

3    A.   Yes, that's my understanding, yes.

4         MR. GOODMAN:   I have nothing

5    further.

6         THE COURT:   Thank you,

7    Mr. McClellan.  Do you have any redirect,

8    Mr. Cronk?

9         MR. CRONK:   Yes, Your Honor.

10        **REDIRECT EXAMINATION**

11   **BY MR. CRONK:**

12   Q.   Mr. McClellan, how do you verify that

13   Mr. Wadlington goes to visit with his lawyer?

14   A.   Through his caption.

15   Q.   So you call and make sure this is what

16   he was doing?

17   A.   Yes (inaudible) appointment (inaudible).

18   Q.   On January 29th, did Mr. Goodman call

19   and say he had an appointment with Mr. Wadlington

20   somewhere?

21   A.   On -- no, not on the 29th.  I hadn't

22   spoke with Mr. Goodman.  He left a message on

23   January 28th.

24   Q.   Mr. Wadlington left the courthouse,

25   checked into a hotel there and waited several

26

1   hours for Mr. Goodman to arrive; is that your

2   understanding what his conditions of release would

3   be?

4                MR. GOODMAN:  I'm going to object to

5   the form of question, Your Honor.

6                THE COURT:  It's overruled.

7        A.   No.  It would only be that he would be

8   with his attorney if they were in Clinton to

9   investigate whatever they had to investigate.

10       Q.   And if Mr. Goodman met with him for a

11  time in Clinton and Mr. Wadlington remained after

12  at a hotel and socialized with friends, would that

13  be consistent with his conditions of release?

14       A.   No, that wouldn't be.  It would be --

15  (inaudible) take care of (inaudible) to Chicago.

16                MR. CRONK:  No other questions.

17                MR. GOODMAN:  May I, Your Honor?

18                THE COURT:  You may.

19                **RECROSS-EXAMINATION**

20  **BY MR. GOODMAN:**

21       Q.   Mr. McClellan, it's me again.

22                Mr. Cronk asked you whether traveling

23  alone to Clinton would be consistent with his

24  bond.  Do you recall that question?

25       A.   Oh, traveling, yeah (inaudible).

1      Q.   Were you aware I was not personally

2    driving him to court?  Weren't you aware of that?

3      A.   Yes.

4      Q.   He was being driven by a companion of

5    his.  Were you aware of that?

6      A.   I knew (inaudible).

7      Q.   And (inaudible)?

8      A.   No (inaudible).

9      Q.   Therefore, is it correct that you assume

10   that driving from Davenport to Clinton (inaudible)

11   drives himself?

12     A.   True.

13     Q.   That was not a violation of his bond?

14     A.   No.

15     Q.   And (inaudible) were you that I was

16   going to spend -- strike that.

17          Mr. McClellan, if (inaudible) to defend

18   his client, he has to review evidence; is that

19   correct?

20     A.   It's my understanding it is.

21     Q.   (Inaudible) and in this case, if I told

22   you the only way (inaudible) to review evidence is

23   to physically go to the office of the United

24   States Attorney and sit with the file, that would

25   be appropriate for the attorney to do; is that

1    correct?

2         A.   Yes.

3         Q.   And if the file is large and contains

4    several pages, that could take several hours to

5    read, even portions of the file; is that correct?

6                   MR. CRONK:   I'll object, Your Honor.

7    It's argumentive and it's certainly beyond the

8    scope of my examination, and it's not within a

9    pretrial services officer's purview to determine

10   what's appropriate for a defense counsel to do, so

11   it's irrelevant.

12                  MR. GOODMAN:   He offered his

13   opinion as to whether his traveling alone to

14   Clinton and waiting there for me was a violation

15   of his bond.   I think it is relevant (inaudible)

16   opinion.

17                  THE COURT:   I think Mr. McClellan's

18   answered the question by opinion and now we're

19   asking for speculation.   Mr. McClellan (inaudible)

20   feel is appropriate in terms, so I'll sustain the

21   objection because it calls for a speculation.

22                  MR. GOODMAN:   I'm not going to argue

23   (inaudible) some of the facts.

24                  THE COURT:   My ruling stands.

25        Q.   (BY MR. GOODMAN)   Mr. McClellan,

1    Mr. Cronk also asked about his remaining in the

2    hotel room after I had left Clinton.  Do you

3    recall that question?

4         A.   Yes.

5         Q.   And your testimony was that that would

6    be inappropriate or that would not be consistent

7    with his bond for him to remain there and to

8    socialize?

9         A.   Right.

10        Q.   Would (inaudible) or friends to gather

11   things together, pack up their belongings and pack

12   up the car, would that be consistent?

13        A.   Yes.

14             MR. GOODMAN:  Nothing further.

15             MR. CRONK:  Nothing further from the

16   Government.

17             THE COURT:  Thank you,

18   Mr. McClellan.  We appreciate your time.

19             Call your next witness.

20             MR. CRONK:  Kelli Sieck.

21             MR. GOODMAN:  I would be willing to

22   stipulate that a phone call was made from the

23   Country Kitchen if this will help.  I don't know

24   if the -- to be honest, (inaudible) details of

25   this meal at the Country Kitchen.

1          MR. CRONK:  I asked him earlier if

2     he would, and he said no.

3          MR. GOODMAN:  I said I would think

4     about it.

5          THE COURT:  Well, he's now said yes.

6     Is there anything else that can't be accomplished

7     by the stipulation?

8          MR. CRONK:  I will proffer what the

9     witness would say, Your Honor.

10          THE COURT:  Why don't you proffer?

11          MR. CRONK:  The witness is a hostess

12     at the Country Kitchen in Clinton, Iowa.  During

13     the afternoon hours of January 29th, the witness

14     was working at the Country Kitchen when a group of

15     black males came in.

16          They ordered a large amount of food

17     to go.  They were there for approximately an hour

18     or more.  During the time that they were there,

19     one of the individuals used a cellular phone while

20     they were waiting.  The other one used the pay

21     phone that was there.

22          The number on the pay phone the

23     witness has learned, and it was the same number

24     that appeared on another witness's phone caller

25     ID, so that's what this witness would testify to.

1    I don't know if the witness can identify

2    Mr. Wadlington, but it appears that's stipulated

3    to.

4                    MR. GOODMAN:  If that would be her

5    testimony.  I don't know who was on the cellular

6    phone.

7                    THE COURT:  That's what I

8    understood, there wouldn't be any testimony as to

9    the cell phone (inaudible).

10                    MR. GOODMAN:  I would stipulate he

11   was there and he ordered food and he made a phone

12   call from a pay phone.

13                    THE COURT:  That's fine.  Ms. Sieck,

14   could you tell me how to spell your last name?

15                    THE WITNESS:  S-I-E-C-K.

16                    THE COURT:  And it's K-E-L-L --

17                    THE WITNESS:  I.

18                    THE COURT:  I appreciate your coming

19   down, and the attorneys have stipulated as to what

20   you probably would have testified to, and I

21   believe you're free to go.  Is that correct,

22   Mr. Cronk?

23                    MR. CRONK:  Yes, Your Honor.

24                    THE COURT:  Thank you very much.

25                    MR. CRONK:  We call Laura Tague.

1          **LAURA TAGUE,**

2       called as a witness on behalf of the

3       Government, being first duly sworn, was

4       examined and testified as follows:

5                    **DIRECT EXAMINATION**

6    **BY MR. CRONK:**

7          Q.    Would you state your name and spell

8    your last name, please.

9          A.    Laura Tague, T-A-G-U-E.

10         Q.    And you are living in Clinton, Iowa?

11         A.    (Inaudible.)

12         Q.    You should say yes or no.

13         A.    Yes.

14         Q.    Can you tell us, do you have a daughter?

15         A.    Yes.

16         Q.    Do you have a daughter named Heather

17   Kline?

18         A.    Yes.

19         Q.    Does she have any children?

20         A.    Yes.

21         Q.    How many?

22         A.    (Inaudible.)

23         Q.    Does she have a child by Euka

24   Wadlington?

25         A.    Yes.

 1          Q.   Do you know him?

 2          A.   A little.  Not too much.

 3          Q.   Do you see him today?

 4          A.   Uh-huh (affirmative response).

 5          Q.   What's he wearing and where is he

 6     sitting?

 7          A.   (Inaudible) red shirt.

 8               MR. CRONK:   The record should

 9     reflect the witness has identified the Defendant.

10               THE COURT:   The record will so

11     reflect.

12          Q.   (BY MR. CRONK)  Ms. Tague, were you home

13     during the afternoon and evening hours of January

14     29th, roughly two weeks ago?

15          A.   (Inaudible.)

16          Q.   Can you tell us, on that occasion, did

17     you receive a phone call from somebody you knew?

18          A.   (Inaudible.)

19          Q.   Who was it?

20          A.   Euka.

21          Q.   Tell us what was -- what happened in

22     this phone call?

23          A.   He just called me up, said was Heather

24     there.  I said no.  He said, "Do you know where

25     she's at?"  And I said, no, I didn't.  I asked who

1    it was and (inaudible) I said she's not here and I

2    hung up.

3         Q.   Then what did you do?

4         A.   I called my daughter to let her know

5    (inaudible).

6         Q.   And how often has Mr. Wadlington tried

7    to get ahold of Heather as far as you know?

8         A.   That's been the first time for a long

9    time.

10        Q.   What's a long time?

11        A.   (Inaudible) years.

12        Q.   How old is the child?

13        A.   She'll be four in March.

14             MR. CRONK:  No other questions.

15             THE COURT:  Mr. Goodman, you may

16   cross-examine.

17                   **CROSS-EXAMINATION**

18   **BY MR. GOODMAN:**

19        Q.   When Euka called and left a message, you

20   didn't -- he never lodged any sort of a threat to

21   your daughter.

22        A.   He didn't have to.  I knew (inaudible).

23        Q.   As far as you know, he's never tried to

24   threaten your daughter in any way, has he?

25        A.   (Inaudible.)

1           MR. GOODMAN:  Nothing further.

2                   **REDIRECT EXAMINATION**

3     **BY MR. CRONK:**

4           Q.   What time was that call?

5           A.   I wasn't paying much attention

6     (inaudible) daughter called and met me up at the

7     house (inaudible).

8           Q.   How was he able to write anything down?

9           A.   (Inaudible) caller ID and copied it down

10    (inaudible).

11          Q.   Does the caller ID indicate the time

12    that the call came in?

13          A.   (Inaudible.)

14          Q.   Is that generally an accurate time

15    within a few minutes?

16          A.   (Inaudible.)

17          Q.   Can you tell us the name of the

18    detective?

19          A.   Ron Heeren.

20               MR. CRONK:  No other questions.

21                 **RECROSS-EXAMINATION**

22    **BY MR. GOODMAN:**

23          Q.   How did you happen to call Ron Heeren?

24          A.   I called my daughter to let my daughter

25    know (inaudible) that (inaudible) around here

1       (inaudible) came up to my house.

2                     MR. GOODMAN:  Thank you.

3                     THE COURT:  You may step down.

4                     MR. CRONK:  Call Heather Kline.

5                     **HEATHER KLINE,**

6       called as a witness on behalf of the

7       Government, being first duly sworn, was

8       examined and testified as follows:

9                     **DIRECT EXAMINATION**

10      **BY MR. CRONK:**

11           Q.   Can you tell us your name please, ma'am.

12           A.   Heather Kline.

13           Q.   Could you spell Kline for us?

14           A.   K-L-I-N-E.

15           Q.   Tell us how old you are.

16           A.   24.

17           Q.   What town do you live in?

18           A.   Clinton.

19           Q.   Do you know Euka Wadlington?

20           A.   Yes.

21           Q.   Do you have a child by him?

22           A.   Yes.

23           Q.   Do you recall about when it was you met

24      Mr. Wadlington?

25           A.   Before (inaudible) probably (inaudible).

1          Q.   Did you develop a relationship with him

2     after you met him?

3          A.   (Inaudible.)

4          Q.   Can you tell us, during the time that

5     you knew him, was he involved in dealing drugs?

6          A.   (Inaudible).

7          Q.   Do you know a Terrance Hood (phonetic)?

8          A.   Yes.

9          Q.   Was he involved in dealing drugs?

10         A.   (Inaudible.)

11         Q.   Did you know a Ulysses Burns (phonetic),

12    also known as (inaudible)?

13         A.   Yes.

14         Q.   Was he involved in dealing drugs?

15         A.   Uh-huh (affirmative response).

16         Q.   Did you know a Titus Crawford

17    (phonetic), also known as Scooby?

18         A.   (Inaudible.)

19         Q.   Was he involved in dealing drugs?

20         A.   (Inaudible.)

21         Q.   Were you present when Mr. Wadlington

22    attempted to get Mr. Crawford to sell drugs for

23    him?

24              MR. GOODMAN:   Objection, leading.

25              THE COURT:   I'll sustain, but

38

1    (inaudible) what this has to do with the issue

2    now.

3                    MR. CRONK:  She's a witness, Your

4    Honor, and Mr. Wadlington knew.

5                    THE COURT:  I understand that, but

6    my understanding is the Motion for Revocation is

7    centered on activities that occurred on

8    January 29th and January 30th of 1999.  Are you

9    (inaudible) with that date?

10                   MR. CRONK:  I'm showing

11   Mr. Wadlington's knowledge on January 29th when he

12   attempted to contact Ms. Kline after being

13   admonished by Judge Wolle that he wasn't to

14   contact any witness.  If Mr. Wadlington knew --

15                   THE COURT:  All right, all right.

16   On that basis, I'll allow you to proceed, but not

17   with leading or suggestive questions.

18       Q.    (BY MR. CRONK)  Do you live at 1869

19   27th Avenue South in Clinton?

20       A.    Yes.

21       Q.    Can you tell us, during that time, did

22   you observe any contact between Mr. Wadlington and

23   Mr. Crawford?

24                   MR. GOODMAN:  During that time,

25   objection.

1      MR. CRONK:  During the time she

2  lived at 1869 - 27th Avenue South.

3      MR. GOODMAN:  Object to the

4  foundation.  I don't have a date for the time she

5  lived at that address.

6      THE COURT:  Why don't you lay a

7  foundation as to when she resided at that address,

8  Mr. Cronk.

9      Q.   (BY MR. CRONK)  When did you live at

10  that address?  You can just give us the year or

11  years.

12      A.   (Inaudible).

13      Q.   During that time, did you observe

14  contact between Mr. Wadlington and Mr. Crawford?

15      A.   Yes.

16      Q.   Is Mr. Crawford your boyfriend now?

17      A.   (Inaudible.)

18      Q.   Describe what you observed between

19  Mr. Wadlington and Mr. Crawford that night.

20      A.   I don't (inaudible).

21      Q.   Did Mr. Crawford tell you what was going

22  on with Mr. Wadlington?

23      MR. GOODMAN:  Object to any hearsay

24  testimony, Your Honor.

25      Q.   (BY MR. CRONK)  Did you ever see

1      Mr. Wadlington with crack cocaine?

2            A.    (Inaudible.)

3            Q.    Was this before January 29th of 1999?

4            A.    Yes.

5            Q.    What did it look like that you saw?

6            A.    (Inaudible) in baggies.

7            Q.    How many?

8            A.    I don't know.

9            Q.    Several?

10           A.    (Inaudible.)

11           Q.    Have you had any contact with

12     Mr. Wadlington over the last year?

13           A.    (Inaudible.)

14           Q.    How about the year before that?

15           A.    (Inaudible.)

16           Q.    So '97 was the last contact?

17           A.    Yeah.

18           Q.    Then did you get notified recently he

19     had attempted to contact you?

20           A.    Yeah.

21           Q.    What did you learn?  How did you find

22     that out?

23           A.    My mom told me.

24           Q.    What did you do then?

25           A.    (Inaudible.)

1        Q.    Why did you do that?

2        A.    (Inaudible.)

3        Q.    Did you go anywhere with the Detective

4    Heeren or meet with him to talk about this?

5        A.    (Inaudible.)

6        Q.    Is that the house --

7        A.    (Inaudible.)

8        Q.    Is it the house where your mother lived?

9        A.    (Inaudible.)

10       Q.    Do you know if he went to your mother's

11   house?

12       A.    (Inaudible.)

13       Q.    How do you know that?

14       A.    (Inaudible.)

15            MR. CRONK:  I don't have any other

16   questions.

17            THE COURT:  Cross-examine,

18   Mr. Goodman?

19            MR. GOODMAN:  Thank you, Your Honor.

20                  **CROSS-EXAMINATION**

21   **BY MR. GOODMAN:**

22       Q.    Ms. Kline, you testified, first of all,

23   that you haven't spoken to (inaudible)?

24       A.    Inaudible.

25       Q.    You didn't have a phone call with him

42

1    sometime this past summer?  He didn't call you

2    sometime this summer and ask about the child?

3         A.   (Inaudible.)

4         Q.   So that would have been the summer of

5    '98?

6         A.   (Inaudible.)

7         Q.   And you had a phone call about the

8    child?

9         A.   (Inaudible.)

10        Q.   Didn't you say you were behind on some

11   payments?

12        A.   (Inaudible.)

13        Q.   Asked him to send you some money?

14        A.   (Inaudible.)

15        Q.   Now, your boyfriend right now is a man

16   by the name of Crawford; is that correct?

17        A.   (Inaudible.)

18        Q.   What's his fist name?

19        A.   (Inaudible.)

20        Q.   Is he in jail?

21        A.   (Inaudible.)

22        Q.   Do you live together?

23        A.   (Inaudible.)

24        Q.   But prior to that, you had a

25   relationship with Mr. Wadlington; is that correct?

1          A.    (Inaudible.)

2          Q.    Did Mr. Wadlington ever mistreat you in

3     this relationship?

4          A.    No.

5          Q.    Now, you testified -- I believe first

6     you testified that it was your belief that

7     Mr. Wadlington was involved in transactions or

8     drug dealing when you knew him.  Was that your

9     belief?

10         A.    (Inaudible.)

11         Q.    Do you know him also to manage a club in

12    town?

13         A.    (Inaudible.)

14         Q.    What was the name of that club?

15         A.    (Inaudible.)

16         Q.    Did you ever go to that club?

17         A.    (Inaudible.)

18         Q.    When you were there, did you see Euka?

19         A.    (Inaudible.)

20         Q.    What was he doing when you went to that

21    club?

22         A.    (Inaudible.)

23         Q.    Was he managing the club as far as you

24    could tell?

25         A.    (Inaudible.)

1    Q.   Ms. Kline, did you ever see him sell

2    drugs out of that club?

3         A.   No.

4         Q.   Do you ever see drugs in that club?

5         A.   No.

6         Q.   Euka was friends with Mr. Crawford; is

7    that correct?

8         A.   (Inaudible.)

9         Q.   You testified that on one occasion you

10   saw Euka with some bags of crack cocaine.  Is that

11   your testimony?

12        A.   (Inaudible.)

13        Q.   Was it just one occasion?

14        A.   (Inaudible.)

15        Q.   You're not sure?

16        A.   (Inaudible.)

17        Q.   And you said it was a few bags?  How

18   many bags, if you remember?

19        A.   (Inaudible.)

20        Q.   How big were the bags?

21        A.   (Inaudible.)

22        Q.   Where was he when you saw him with these

23   bags of crack cocaine?

24        A.   (Inaudible.)

25        Q.   You're not sure, but you think it might

45

1    have been at your apartment?

2          A.    Yes.

3          Q.    I'm sorry, I didn't get that address.

4    Was it on 27th Avenue?  What was the address of

5    that apartment?

6          A.    (Inaudible.)

7          Q.    Camanche Avenue?

8          A.    (Inaudible.)

9          Q.    Did you live alone at that time?

10         A.    No.

11         Q.    Who were you living with?

12         A.    (Inaudible.)

13         Q.    What was your friend's name?

14         A.    (Inaudible.)

15         Q.    Just one friend?

16         A.    Uh-huh (affirmative response).

17         Q.    Euka would come visit you at that

18   apartment?

19         A.    (Inaudible.)

20         Q.    And one of the times he was there, he

21   might have had some bags of crack cocaine with

22   him?

23         A.    (Inaudible.)

24         Q.    Do you recall who else was present when

25   you saw him with those bags of crack cocaine?

1          A.     (Inaudible.)

2          Q.     Was Amy (phonetic) there?

3          A.     (Inaudible.)

4          Q.     Was anyone with Euka?

5          A.     (Inaudible.)

6          Q.     Did -- where did he have them?  Did he

7     have them in his pocket or his hand or a bag?

8          A.     (Inaudible).

9          Q.     You're pretty sure you saw some crack

10    cocaine in his possession on at least one

11    occasion?

12         A.     (Inaudible.)

13         Q.     Is it possible that you're mistaken

14    about that?

15         A.     (Inaudible.)

16         Q.     But you don't recall whether it was in

17    his hand -- I'm sorry.  I don't mean to pester

18    you, but I want to be clear.  As you sit here now,

19    you can't recall whether he had it in his hand or

20    a bag, you just recall seeing it; is that correct?

21         A.     (Inaudible.)

22         Q.     Do you remember any other details that

23    might help us?

24         A.     (Inaudible.)

25         Q.     Was he -- did you ever see him use

1    cocaine?

2          A.    No.

3          Q.    You say you don't recall how big it was?

4                MR. CRONK:   Asked and answered.

5                THE COURT:   Sustained.  I think we

6    need to move off of this subject.

7          Q.    (BY MR. GOODMAN)  After your mother

8    contacted you and said Euka wanted to see you, you

9    called Detective Heeren; is that correct?

10         A.    Yes.

11         Q.    Why did you call Detective Heeren?

12         A.    (Inaudible.)

13         Q.    Did he tell you why?

14         A.    (Inaudible.)

15         Q.    How many times had you talked with

16   Detective Heeren about Euka Wadlington?

17                MR. CRONK:   Irrelevant.

18                THE COURT:   Overruled.

19         A.    (Inaudible.)

20         Q.    He asked you about Euka's drug

21   activities?

22         A.    Yes.

23         Q.    Did he ask you about whether Euka had

24   ever threatened you?

25         A.    (Inaudible.)

1    Q.   And you told him Euka had never

2    threatened you; is that correct?

3         A.   (Inaudible.)

4         Q.   But he still told you if Euka should try

5    to call you, you should immediately contact him?

6         A.   (Inaudible.)

7         Q.   Did he tell you why you should do that?

8         A.   No.

9         Q.   Didn't tell you Euka was in a lot of

10   trouble?

11        A.   (Inaudible.)

12        Q.   Ever tell you that you were in trouble?

13        A.   No.

14        Q.   Did he tell you that your boyfriend,

15   Mr. Crawford, might be in trouble?

16        A.   (Inaudible.)

17             MR. GOODMAN:   Nothing further,

18   Judge.

19                  **REDIRECT EXAMINATION**

20   **BY MR. CRONK:**

21        Q.   When you were talking with Officer

22   Heeren, didn't you tell him that Mr. Wadlington

23   had tried to have Titus Crawford sell drugs for

24   him?

25        A.   (Inaudible.)

1      Q.   Was that true?

2      A.   (Inaudible.)

3      Q.   Didn't you tell him that one of the

4    reasons why you didn't really want to talk to him

5    was because you were afraid of Mr. Wadlington?

6              MR. GOODMAN:   I do object to the

7    leading questions.   I don't think it's

8    appropriate.

9              THE COURT:   Sustained.

10     Q.   (BY MR. CRONK)   What did you tell him

11   about how comfortable you were talking to him

12   about Mr. Wadlington?

13     A.   (Inaudible.)

14     Q.   Why weren't you?

15     A.   (Inaudible.)

16     Q.   What might happen to you if you get

17   involved?

18             MR. GOODMAN:   Objection.

19             THE COURT: Overruled.

20     A.   (Inaudible.)

21     Q.   Did you hear something about what he

22   could do?

23     A.   (Inaudible.)

24     Q.   Did he tell you he could seriously hurt

25   you?

1          MR. GOODMAN:  Objection, leading.

2     Q.   Did you take a trip to Chicago to see

3   Mr. Wadlington?

4     A.   (Inaudible.)

5     Q.   Did you go to (inaudible) on one

6   occasion?

7     A.   (Inaudible.)

8     Q.   Did you receive something to bring back?

9     A.   (Inaudible.)

10    Q.   What was it?

11    A.   (Inaudible.)

12    Q.   What was it in?

13    A.   (Inaudible.)

14    Q.   Did you get directions from

15   Mr. Wadlington about what to do with it?

16    A.   (Inaudible.)

17    Q.   Did he meet you back in Clinton then?

18    A.   Yeah.

19    Q.   Did he throw something out of the trunk?

20    A.   (Inaudible.)

21    Q.   What was it?

22    A.   I don't know (inaudible).  I don't know

23   (inaudible).

24          MR. CRONK:  No other questions.

25          THE COURT:  Do you have any recross,

1    Mr. Goodman?

2                    MR. GOODMAN:  Yes, Your Honor.

3                    **RECROSS EXAMINATION**

4    **BY MR. GOODMAN:**

5         Q.   Ms. Kline, Euka's never physically

6    struck you, has he?

7         A.   No.

8         Q.   Have you ever seen him hurt anybody?

9         A.   No.

10        Q.   Have you ever seen him point a gun at

11   anybody?

12        A.   (Inaudible.)

13        Q.   Have you ever heard him threaten

14   anybody?

15        A.   No.

16        Q.   You said you visited him a couple times

17   in Chicago?

18        A.   (Inaudible.)

19        Q.   Do you recall when that was?

20        A.   (Inaudible.)

21        Q.   Where was Euka living at that time?

22        A.   (Inaudible.)

23        Q.   Was that your first time in Chicago?

24        A.   (Inaudible.)

25        Q.   You went with Tina Gostic (phonetic)?

1      A.    (Inaudible.)

2      Q.    Did you stay with Euka?

3      A.    (Inaudible.)

4      Q.    Yes?

5      A.    (Inaudible.)

6      Q.    You stayed overnight?

7      A.    (Inaudible.)

8      Q.    When you drove back to Clinton, Euka put

9   something in your car.  Is that what your

10  testimony was?

11     A.    (Inaudible.)

12     Q.    He put a laundry detergent in your car?

13     A.    I don't know what it was.

14     Q.    But he put something that was in a

15  laundry detergent box in your car?

16     A.    (Inaudible.)

17     Q.    Did he put it in the trunk?

18     A.    (Inaudible.)

19     Q.    Did he say anything when he put it in

20  there?

21     A.    (Inaudible.)

22     Q.    You drove back to Clinton with Tina?

23     A.    (Inaudible.)

24     Q.    When you got back to Clinton, he met you

25  there?

1    A.    (Inaudible.)

2    Q.    When -- did he put it in your car as you

3    were getting ready to leave Chicago?

4    A.    (Inaudible.)

5    Q.    You didn't see him put it in there?

6    A.    (Inaudible.)

7              MR. CRONK:  (Inaudible.)

8              MR. GOODMAN:  I didn't bring this

9    up.  Mr. Cronk did, and I have the right to

10   question about it since he's making --

11             THE COURT:  What was the question?

12             MR. GOODMAN:  I forgot.

13   Q.    (BY MR. CRONK)  Did you see him put it

14   in your car?

15   A.    (Inaudible.)

16   Q.    How did you know it was in your car?

17   A.    (Inaudible.)

18   Q.    When you set out to drive back to

19   Clinton from Chicago, was Euka there to see you

20   off?

21   A.    (Inaudible.)

22   Q.    Where did you leave from, from his

23   apartment?

24   A.    (Inaudible.)

25             MR. CRONK:  This is not relevant

1    now.

2              THE COURT:  I'll (inaudible).

3         Q.   (BY MR. GOODMAN)  Do you recall if

4    (inaudible)?

5         A.   (Inaudible.)

6         Q.   It was at that time he told you there's

7    something in your car, meet us in Clinton with it?

8              MR. CRONK:  Asked and answered.

9              THE COURT:  Overruled.

10        Q.   (BY MR. GOODMAN)  Then you and Tina

11   drove back to Clinton?

12        A.   (Inaudible.)

13        Q.   But you say Euka was already there when

14   you got back there?

15        A.   (Inaudible.)

16        Q.   What car was Euka driving?

17             MR. CRONK:  Irrelevant.

18             THE COURT:  Sustained.

19        Q.   (BY MR. GOODMAN)  Where did you next see

20   Euka when you got back to Clinton, at your

21   apartment?

22        A.   (Inaudible.)

23        Q.   Then Euka -- did you see Euka go into

24   your car and take something out?

25        A.   (Inaudible.)

1      Q.    You just assumed that he did?

2                  MR. CRONK:  Asked and answered.

3                  THE COURT:  Sustained.

4                  MR. GOODMAN:  Nothing further.

5                  THE COURT:  Anything further?

6                  MR. CRONK:  One thing.

7                  **REDIRECT EXAMINATION**

8      **BY MR. CRONK:**

9      Q.    Ms. Kline, has Mr. Wadlington provided

10     support for your child you have with him?

11                 MR. GOODMAN:  Objection.

12                 THE COURT:  Sustained.

13     Q.    (BY MR. CRONK)  When you spoke with him

14     on the phone over the summer and asked for money,

15     why did you do that?

16     A.    (Inaudible.)

17                 MR. CRONK:  That's all I have.

18                 **RECROSS-EXAMINATION**

19     **BY MR. GOODMAN:**

20     Q.    What did he say to you on the phone call

21     about sending you money?  Did he say that he

22     would?

23     A.    (Inaudible.)

24     Q.    Did he know where to contact you after

25     that?

1       A.   (Inaudible.)

2                 MR. GOODMAN:   Nothing further.

3                 MR. CRONK:   That's all I have.

4                 THE COURT:   You may step down.

5                 Call your next witness.

6                           **RON HEEREN,**

7       called as a witness on behalf of the

8       Government, being first duly sworn, was

9       examined and testified as follows:

10                      **DIRECT EXAMINATION**

11      **BY MR. CRONK:**

12      Q.   Would you state your name and then spell

13      your last name, please.

14      A.   Yes.  Ron Heeren, the spelling would be

15      H-E-E-R-E-N.

16      Q.   What is your occupation?

17      A.   Police officer, City of Clinton, Iowa.

18      Q.   How long have you been a police officer?

19      A.   Approximately 12 years.

20      Q.   Were you a police officer on

21      January 29th of 1999?

22      A.   Yes, sir.

23      Q.   You were with the Clinton Police

24      Department on that date?

25      A.   Yes.

1    Q.   Tell us, did you have occasion to

2    receive contact that evening from a Heather Kline?

3    A.   Yes.

4    Q.   Can you tell us about what time you were

5    contacted by Heather?

6    A.   I believe it was in the area of

7    7 o'clock (inaudible).

8    Q.   Can you tell us what the nature of that

9    contact was?

10   A.   Yes.  She had indicated to me that the

11   person she knows as Euka Wadlington had attempted

12   to contact her mother to find out where she was.

13   Q.   What did you do with that information?

14   A.   (Inaudible) call her mother (inaudible)

15   conversations (inaudible) did or she had, a person

16   identified himself as Euka.  She had caller ID.  I

17   believe at 6:37 p.m., I believe it was, and

18   (inaudible) she gave that information to me

19   (inaudible).

20          At that point in time, Mr. Greenwald was

21   able to take that number and verify (inaudible)

22   pay phone at Country Kitchen.

23   Q.   Is that the same Country Kitchen where

24   Kelli Sieck works?

25   A.   Yes.

58

1       Q.   Then did you go to Country Kitchen?

2       A.   Yes.

3       Q.   Did you speak with Kelli Sieck?

4       A.   Yes, I did.

5       Q.   After receiving information from her,

6    what did you do?

7       A.   At that point in time, I had gotten

8    copies of (inaudible) motels and asked the front

9    desk clerks (inaudible) anything unusual had taken

10   place this evening.  I went to the (inaudible).

11      Q.   Did you learn then that there were

12   people there that you were interested in?

13      A.   Yes.

14      Q.   Did you have occasion to observe anyone

15   you recognized?

16      A.   Later in the evening, yes.

17      Q.   About what time was it that you came

18   upon the Frontier Hotel?

19      A.   Initially?

20      Q.   Yes.

21      A.   I believe it was in the area of 9, 9:15.

22      Q.   Tell us about when it was you first saw

23   Mr. Wadlington.

24      A.   I couldn't give the exact time.  After

25   10:30 or 11.

1      Q.   Where did you see him?

2      A.   In the pool area of the Frontier.  Later

3   on (inaudible).

4      Q.   When you saw him in the pool area, you

5   think that was around 10:30, you say?

6      A.   (Inaudible.)

7      Q.   What was he doing?

8      A.   (Inaudible) socializing.

9      Q.   Did you see Mr. Goodman there?

10      A.   No, I did not.

11      Q.   At any time, did you see Mr. Goodman

12   there?

13      A.   During that evening?

14      Q.   Yes.

15      A.   No (inaudible).

16           MR. CRONK:  No other questions.

17              **CROSS-EXAMINATION**

18   **BY MR. GOODMAN:**

19      Q.   Officer Heeren, you've spoken several

20   times to Heather Kline?

21      A.   Yes.

22      Q.   And you told her if she was ever

23   contacted by Euka Wadlington, she should

24   immediately contact you?

25      A.   Yes.

60

1      Q.   Have you done this with other witnesses

2   as well?

3              MR. CRONK:   Irrelevant.

4              THE COURT:   Sustained.

5      Q.   (BY MR. GOODMAN)   Officer Heeren, you

6   know Euka Wadlington fairly well; is that correct?

7      A.   I don't know him real well, no.

8      Q.   You've stopped him many times, haven't

9   you?

10     A.   I have?

11     Q.   Have you?

12     A.   No.

13     Q.   Have you been to his club?

14     A.   Yes.

15     Q.   You've seen him at his club?

16     A.   No, I have not.

17     Q.   Did you ever raid his club and look for

18  drugs?

19     A.   Yes.

20     Q.   When was that?

21     A.   I believe it was 1997.  I believe

22  (inaudible).

23     Q.   Was that pursuant to a search warrant?

24     A.   Yes.

25     Q.   I take it that warrant would be filed

1    with the Clerk?

2         A.   Yes.

3         Q.   And the report of what you found in that

4    search?

5         A.   Yes.

6         Q.   You didn't find any drugs in that

7    search, did you?

8         A.   I didn't search (inaudible).

9         Q.   Do you know if any drugs were found?

10        A.   I don't believe there was.

11        Q.   Did an informant tell you that drug

12   dealing was taking place at that club?

13        A.   Yes.

14        Q.   And that is the basis for your search

15   warrant?

16        A.   Yes.

17        Q.   Isn't it true you told Mr. Wadlington

18   sometime in 1997 there's a lot of corn fields

19   between here and Chicago and he could be found

20   dead in one of them?

21        A.   No.

22        Q.   Never said that to him?

23        A.   No.

24        Q.   Never made any threat to Mr. Wadlington?

25        A.   I never spoke to Mr. Wadlington.

1    Q.   Did you speak to him on January 29th,

2    1999?

3    A.   No.  I believe I might have said hi

4    (inaudible).

5    Q.   Did you participate in the traffic stop?

6    A.   I remained in the vehicle most of the

7    time (inaudible) involved in that conversation.

8    Q.   How many (inaudible) were involved in

9    that traffic stop?

10              MR. CRONK:   Irrelevant.

11              THE COURT:   Overruled.

12    A.   I would estimate (inaudible).

13    Q.   Was there any sort of roadblock set up?

14    A.   No (inaudible).

15    Q.   Officer Heeren, when was the first time

16    you saw Euka Wadlington on that evening?

17    A.   (Inaudible.)

18    Q.   Around 10:30, that's the first time you

19    saw him?

20    A.   That evening?

21    Q.   Yes.

22    A.   Yes.

23    Q.   Did you see him earlier?

24    A.   No.

25    Q.   Did you follow him around earlier?

1          A.    No.

2          Q.    Do you know if anyone was following him

3     around earlier?

4          A.    I don't believe so.

5          Q.    You arrived at the hotel around 9 or

6     9:15?

7          A.    Yes.

8          Q.    You spoke to the clerk?

9          A.    Yes.

10         Q.    You said, "Is there any unusual

11    activity?"

12         A.    Yes.

13         Q.    Are those your words?

14         A.    I believe so.

15         Q.    Did you say, "Are there any black people

16    hanging out at the hotel?"

17         A.    I didn't say that.  I said (inaudible).

18         Q.    Did you describe Euka?

19         A.    I described the individuals based on

20    what I had (inaudible).

21         Q.    What did you describe?

22         A.    (Inaudible) four to six black

23    individuals (inaudible).

24         Q.    When you say "unusual activity," do you

25    mean large black males at the hotel?

64

1        A.   No.   I meant did we have anybody

2    matching that kind of description check into the

3    hotel, any unusual activity associated with that.

4        Q.   And she said, yes, there was unusual

5    activity?

6        A.   Yes.

7        Q.   And that would be them hanging out by

8    the pool.  Some of them were swimming; is that

9    correct?

10        A.   No.   I believe what struck her

11    (inaudible) very short three at the same time at a

12    time (inaudible).

13        Q.   Have you seen the phone bill?

14        A.   (Inaudible.)

15        Q.   It was $57?

16        A.   I believe it was a little bit over

17    (inaudible).

18        Q.   So it was $57 with the phone bill and

19    video rental; is that correct?

20        A.   (Inaudible.)

21        Q.   And she found that unusual, that the

22    guests at the hotel would run up a $57 bill

23    between the phones and video?

24        A.   (Inaudible.)

25        Q.   She didn't say there was any criminal

1    activity going on, did she?

2         A.   No.

3         Q.   When you saw Euka around 10:30, did you

4    see him come into the hotel?

5         A.   No.  I believe he was (inaudible).

6         Q.   He was there from 9 o'clock on?

7         A.   (Inaudible.)

8         Q.   You left at some point?

9         A.   Yes.

10        Q.   Where did you go?

11        A.   I went back to the (inaudible).

12        Q.   Then you got a call to come back to the

13   hotel because Euka had been spotted (inaudible)?

14        A.   (Inaudible.)

15        Q.   You went back to the police station and

16   called Agent Dasso and said you know where Euka

17   is?

18        A.   Yes.

19        Q.   So after you got to the hotel at 9, was

20   surveillance set up at the Best Western?

21        A.   From the first time I got there?

22        Q.   Yes.

23        A.   (Inaudible.)

24        Q.   When was surveillance first set up?

25        A.   Sometime after 10:30, I believe

66

1    (inaudible).

2         Q.   You're sure about that?  There was no

3    one watching the hotel prior to 10:30?

4         A.   Not that I'm aware of.

5         Q.   You arrived back at the hotel at 10:30;

6    is that correct?

7         A.   Give or take. (Inaudible) not exactly

8    10:30, give or take a few minutes (inaudible)

9    anywhere from 10:30 to 10:45, in that time frame.

10        Q.   So between 10:30 and 10:45, you drove

11   back to the Best Western; is that correct?

12        A.   Sometime in that time frame or close

13   proximity, yes.

14        Q.   And at that time there were no other

15   police officers there?

16        A.   No, I don't believe so.

17        Q.   You got out of your car, you entered the

18   hotel.

19        A.   Yes.

20        Q.   You went into the lounge area; is that

21   correct?

22        A.   Actually (inaudible) office area.

23        Q.   Spoke to the clerk?

24        A.   Spoke to the clerk, contacted the hotel

25   manager and sat in his office (inaudible)

1    shouting.

2           Q.   Where were you when you observed Euka

3    Wadlington socializing?

4           A.   In the -- I believe it was in the

5    manager's office.  In the manager's office,

6    through a window (inaudible).

7           Q.   Did you also ask the manager whether

8    Euka's attorney had been to see him at the hotel?

9           A.   I think I asked who or I asked about

10   people coming in and (inaudible) manager, front

11   desk person indicated the individuals (inaudible)

12   to her and said, "I'm looking for a Leonard

13   Goodman.  When he comes in, direct him

14   (inaudible)," and that's where the conversation

15   ended.

16          Q.   Did he tell you, in fact, the attorney

17   Leonard Goodman had arrived?

18          A.   (Inaudible.)

19          Q.   That would have been around what,

20   7 o'clock?

21          A.   I don't know.

22          Q.   Certainly earlier in the evening; is

23   that correct?

24          A.   Yes.

25          Q.   Did you know that this person, Leonard

1    Goodman, was Euka's attorney?

2         A.   I think when I heard the name I did,

3    yes.

4         Q.   Is it a common practice to conduct

5    surveillance of a person -- of a defendant in a

6    criminal case while he's visiting his attorney?

7              MR. CRONK:   Argumentive.

8              THE COURT:   Sustained.

9         A.   (Inaudible.)

10        Q.   After you heard that his attorney had

11   been there to visit, did you then go home and

12   terminate your surveillance or your investigation

13   of Mr. Wadlington?

14        A.   No.

15        Q.   You thought the attorney was involved in

16   some criminal activity with Mr. Wadlington, is

17   that what you were thinking?

18        A.   No.

19        Q.   What were you thinking?

20        A.   (Inaudible) potential witness

21   (inaudible).

22        Q.   So you thought maybe Euka and his

23   attorney were going to go threaten witnesses; is

24   that what you were concerned about?

25        A.   I don't know who's going to go threaten

69

1    witnesses (inaudible).

2         Q.   You typically -- if the defendant is out

3    on bond, you typically follow him around to make

4    sure he doesn't contact witnesses?

5              MR. CRONK:  Argumentive.

6              THE COURT:  Sustained.

7              MR. GOODMAN:  I have nothing

8    further.

9              THE COURT:  Redirect?

10             MR. CRONK:  Yes.

11             **REDIRECT EXAMINATION**

12   **BY MR. CRONK:**

13        Q.   Based on your investigation, is

14   Mr. Wadlington known to carry weapons?

15             MR. GOODMAN:  Objection.

16             THE COURT:  Overruled.

17        A.   Yes.

18        Q.   At the time four police officers or

19   four separate vehicles were used to stop

20   Mr. Wadlington, can you tell us, was he abiding by

21   the traffic laws at that time?

22        A.   (Inaudible) conversations (inaudible)

23   officer involved in the traffic stop and the

24   officer involved indicated (inaudible) speeding.

25             MR. GOODMAN:  Objection, hearsay

70

1    response.

2                    THE COURT:  Overruled.

3         A.    And also according to Officer

4    (inaudible) indicated might be impaired or

5    intoxicated.

6         Q.    During the time that you observed

7    Mr. Wadlington, was he drinking?

8         A.    At the Frontier (inaudible) they had

9    glasses in hand.  I don't know what was in them

10   but (inaudible).

11                   MR. CRONK:  No other questions.

12                   **RECROSS-EXAMINATION**

13   **BY MR. GOODMAN:**

14        Q.    Officer Heeren, is it your testimony

15   he's known to carry weapons; is that correct?

16        A.    (Inaudible) investigation.

17        Q.    He's been stopped many times when he

18   lived in Clinton, hasn't he?

19        A.    I never stopped him.

20        Q.    Are you aware he has been stopped many

21   times while driving in Clinton?

22        A.    As I recall, I recall (inaudible).

23        Q.    Has he ever been known to have a weapon

24   in his possession?

25        A.    At the time of the stops?

1      Q.   Yes.

2      A.   (Inaudible.)

3      Q.   Has he ever been known to have a weapon

4    in his possession when stopped by a police

5    officer?

6      A.   I don't know.

7      Q.   You don't have any information that a

8    police officer has ever found him in possession of

9    a gun, do you?

10     A.   No.

11     Q.   Then when the officers searched his

12   club, as far as you know, no weapons were found;

13   is that correct?

14     A.   That is correct.

15     Q.   So the information that he is known to

16   carry guns, that comes from some of your

17   informants?

18     A.   Yes.

19     Q.   Drug dealers?

20     A.   Not all of them.

21     Q.   So somebody not a drug dealer says he

22   carries guns?

23     A.   Yes.

24     Q.   Who is that?

25               MR. CRONK:   Objection.

72

1        THE COURT:  Sustained.

2        Q.   (BY MR. GOODMAN)  How many people have

3    told you that Euka carries guns?

4        A.   (Inaudible.)

5        Q.   More than two?

6        A.   Yes.

7        Q.   Can you name one person that's told you

8    that?

9             MR. CRONK:  Objection.

10            THE COURT:  Sustained.

11       Q.   (BY MR. GOODMAN)  You said that he had a

12   glass in his hand at the Best Western.

13       A.   Yes.

14       Q.   You observed that from the TV monitor?

15       A.   No, from a (inaudible).

16       Q.   And that was when he was in the pool

17   area socializing?

18       A.   Yes.

19       Q.   Talking to somebody?

20       A.   Yes.

21       Q.   How long after you made that observation

22   did you leave the hotel?

23       A.   (Inaudible.)

24       Q.   Had you ever learned that he had been

25   dropped off at the hotel somewhere around 10:30 by

73

1     his attorney?

2          A.   No.

3                    MR. GOODMAN:  Nothing further.

4                    THE COURT:  Anything else?

5                    MR. CRONK:  No.

6                    THE COURT:  All right, Officer

7     Heeren, you may step down.

8                    We're going to take a recess at this

9     point in time.

10                    (A recess was held off the record

11    from 11:40 a.m. to 12:05 p.m.)

12                    MR. CRONK:  We call Sammy Walker.

13                    THE COURT:  Mr. Walker, step forward

14    and be sworn, please.

15                    **ARTHUR "SAMMY" WALKER,**

16      called as a witness on behalf of the

17      Government, being first duly sworn, was

18      examined and testified as follows:

19                    **DIRECT EXAMINATION**

20    **BY MR. CRONK:**

21         Q.   Would you state your name, then spell

22    your last name, please.

23         A.   Arthur Walker, W-A-L-K-E-R.

24         Q.   Do you go by Sammy?

25         A.   Yes.

1       Q.   Can you tell us how old you are?

2       A.   38.

3       Q.   Where do you live?

4       A.   (Inaudible.)

5       Q.   Do you work?

6       A.   Yes.

7       Q.   Where do you work?

8       A.   (Inaudible.)

9       Q.   Is that, like, a junk yard?

10      A.   Yes, it is.

11      Q.   Can you tell us, do you know Euka

12  Wadlington?

13      A.   Yes, I do.

14      Q.   Is that the gentleman in the white shirt

15  with the tie sitting at counsel table here?

16      A.   Yes.

17      Q.   Mr. Walker, can you tell us, did you

18  have contact with Mr. Wadlington in the early part

19  of December of this last year?

20      A.   Yes.

21      Q.   Can you tell us, on what occasion --

22  tell us on what occasion that occurred.

23      A.   He showed up (inaudible).

24      Q.   Who?

25      A.   (Inaudible.)

 1          Q.    What specifically did he ask?

 2          A.    What he had been up to, what things he

 3     had gone through, just that he was getting --

 4     making arrangements to set him up or something

 5     like that.

 6          Q.    Set who up?

 7          A.    (Inaudible.)

 8          Q.    What was your response to his inquiry

 9     about Mark Thomas?

10          A.    I said that I didn't want to get

11     involved.  I don't know (inaudible) between them.

12          Q.    As far as you knew, Mark Thomas and

13     Mr. Wadlington knew each other?

14          A.    Yes.

15          Q.    And after you told him you didn't want

16     to take part in it, you didn't want to talk to him

17     about it, what did he do?

18          A.    Asked me a few questions (inaudible) and

19     he drove (inaudible).

20          Q.    Let's talk about that.  You're in an

21     office, are you?  Is that right?  At first?

22          A.    At first (inaudible).

23          Q.    How many people are we talking about

24     here?

25          A.    Three.

1        Q.    Someone else was with Mr. Wadlington?

2        A.    Yes.

3        Q.    Did you know that person?

4        A.    No.

5        Q.    After you told him that you didn't want

6    to be involved, was that there at the first

7    location?

8        A.    What do you mean by "the first

9    location?"

10       Q.    Where he came in and saw you.

11       A.    No.

12       Q.    Where did you tell him that?

13       A.    Over in the (inaudible).

14       Q.    Where were you going?

15       A.    Where was I going?

16       Q.    Yes.

17       A.    I was headed (inaudible) house.

18       Q.    Why were you going there?

19       A.    Because I didn't want to be involved in

20    the conversation (inaudible).

21       Q.    But Mr. Wadlington didn't leave?

22       A.    He followed Mr. (Inaudible) house.

23       Q.    Was he talking to you while you were

24    walking?

25       A.    Yes.

77

1        Q.   What was he saying?

2        A.   (Inaudible.)  I was trying not to listen

3    to what he had to say, because I did not want to

4    be involved.  I would (inaudible) truck.

5        Q.   Did he want to know where Mark was?

6        A.   I can't recall if he ever asked that

7    question.

8        Q.   He wanted information from you?

9        A.   Just what Mark was up to, yeah.

10       Q.   Meaning what?

11            MR. GOODMAN:  Objection.

12            THE COURT:  Sustained.

13       Q.   (BY MR. CRONK)  All right, now, how far

14   a walk did you have to go to get to your parents'

15   house?

16       A.   About 50 yards.

17       Q.   While you were walking, where was

18   Mr. Wadlington?

19       A.   Beside (inaudible).

20       Q.   What were you telling him?

21       A.   (Inaudible.)

22       Q.   How many times do you think you repeated

23   that?

24       A.   I don't know, a few.

25       Q.   What happened when you got to the front

78

1    of your parents' house?

2         A.   He (inaudible) van and drove away.

3         Q.   What did you do?

4         A.   I went back to work.

5         Q.   As soon as he left, you came back out of

6    the house and went back over to the yard?

7         A.   Yes.

8         Q.   Did you talk to Mr. Thomas after that?

9         A.   (Inaudible) car and I said, "You just

10   missed Euka."  (Inaudible) I don't know if it was

11   (inaudible) same day or next day.

12        Q.   How long do you think he was there?

13   Mr. Wadlington?

14        A.   15 minutes, tops.  (Inaudible).

15             MR. CRONK:  No other questions.

16             THE COURT:  (Inaudible.)

17                   **CROSS-EXAMINATION**

18   **BY MR. GOODMAN:**

19        Q.   Mr. Walker, you said you didn't recall a

20   lot of conversation you had with Euka during this

21   10 or 15 minutes?

22        A.   True.

23        Q.   Do you recall him telling you that a car

24   had broke down?

25        A.   No, I don't.

1    Q.   Do you recall him asking about his

2    brother (inaudible)?

3    A.   Yeah (inaudible).

4    Q.   Do you recall talking about buying a

5    car?

6    A.   Yeah.

7    Q.   And he was asking -- did he ask you if

8    you knew where his brother was?

9    A.   (Inaudible.)

10   Q.   That he was looking for his brother,

11   that Euka wanted to contact his brother?

12   A.   Yeah, that's what he told me.

13   Q.   Was that about a car?

14   A.   I don't know that. (Inaudible) I'm not

15   sure.

16   Q.   How did the conversation about a car

17   come up?

18   A.   I said, "If you want to talk (inaudible)

19   I would be willing to (inaudible)."

20   Q.   So he hadn't mentioned that his car had

21   broken down?

22   A.   (Inaudible.)  I don't recall.

23   Q.   He never threatened you in any way, did

24   he?

25   A.   (Inaudible.)

1     Q.   Do you have a case pending, drug case?

2     A.   No.

3     Q.   Did you have a drug case?

4          MR. CRONK:   Irrelevant.

5          THE COURT:   Overruled.

6     Q.   Did you have a drug case?

7     A.   Do I have a drug case?

8     Q.   Did you have one you were arrested for?

9     A.   No.

10    Q.   Never were arrested?

11    A.   No.

12    Q.   Never had some involvement with Mark

13 Thomas in some sort of criminal proceeding?

14    A.   I don't understand.

15    Q.   Was Mark Thomas -- did he ever tell the

16 police something about you?

17    A.   (Inaudible.)

18    Q.   (Inaudible) drug user?

19          THE COURT:   You're --

20          MR. GOODMAN:   I'll strike that.   I'm

21 sorry.

22    Q.   (BY MR. GOODMAN)   How do you know Euka

23 Wadlington?

24    A.   He was (inaudible).

25    Q.   You never bought drugs from him, did

1    you?

2                    THE COURT:  You're getting into an

3    area, Counsel, where this witness may need to have

4    an attorney (inaudible).  I'm going to ask you to

5    move on to a different area.

6                    MR. GOODMAN:  Okay.

7         Q.   It's your testimony -- did he bring up

8    the subject of Mark Thomas, or did you bring up

9    that subject?  Do you recall?

10        A.   I don't recall.

11        Q.   It may have been you that brought it up?

12        A.   I don't think.

13        Q.   You said it was a mutual friend, though,

14   so you know Mark Thomas?

15        A.   (Inaudible.)

16        Q.   Is it possible you brought up the

17   subject?

18        A.   I don't think so.

19        Q.   But you're not sure?

20        A.   I am not absolutely positive.

21        Q.   As far as you know, Euka never asked you

22   where Mark Thomas was; is that correct?

23        A.   He (inaudible).

24        Q.   Never asked how to get ahold of him, did

25   he?

1        A.    I don't think so.

2        Q.    Just might have asked you some questions

3    about Mark?

4        A.    Yes.

5        Q.    He wanted to know if you thought that

6    Mark was trying to set him up?

7        A.    I think that's about right.

8        Q.    That's about what he asked you?

9        A.    I think so, yes.

10            MR. GOODMAN:  I have nothing

11    further, Judge.

12            MR. CRONK:  Nothing further.

13            THE COURT:  Mr. Walker, thank you.

14    You may step down.  You are excused.

15            (Inaudible) now in a position to

16    proceed with proffers?

17            MR. CRONK:  I believe so, Your

18    Honor.

19            THE COURT:  You may proceed.

20            MR. CRONK:  Your Honor, I would

21    proffer that if Bill Greenwald, police officer

22    with the (inaudible) Police Department assigned to

23    the Blackhawk Area Task Force, were to testify, he

24    would indicate he went -- that he observed a group

25    of six to eight individuals leaving the Frontier

83

1    Motel at about 10 minutes to midnight on

2    January 29th, 1999; that they proceeded to a white

3    Dodge Intrepid and a tan Chevy Blazer.  They were

4    placing bags and containers into the back of the

5    Blazer and the Dodge Intrepid.

6              One of those individuals was

7    Mr. Wadlington, who got into the driver's seat of

8    the Chevy Blazer.  Officer Greenwald then followed

9    the vehicle and paced it as it went down the road.

10   The vehicle went in excess of the speed limit, in

11   fact, approximately 65 miles an hour.

12             Officer Greenwald began to pace the

13   vehicle, meaning the Chevy tan Blazer, that was

14   traveling at a high rate of speed, and at that

15   point, he was able to clock it at 47 miles per

16   hour.  The speed limit was 35.  He was not able to

17   track both vehicles because the Dodge Intrepid was

18   traveling a distance ahead at a faster rate of

19   speed.

20             Officer Greenwald was notified by

21   the dispatcher during this surveillance that

22   Mr. Wadlington's driving privileges were

23   suspended.  The vehicle approached the Highway 30

24   Bridge, which is a bridge that crosses the

25   Mississippi River from Iowa into Illinois, and as

1    it got onto -- approached the Highway 30 Bridge,

2    Officer Greenwald activated emergency lights and

3    siren on his vehicle.  Mr. Wadlington slowed down

4    and stopped.  Officer Greenwald approached the

5    vehicle, and there were other officers there for

6    his safety, and he did a traffic stop at that

7    time.

8              Mr. Wadlington was subsequently

9    given a field sobriety test and a Breathalyzer.

10    He was given a citation for speeding and was

11    released at approximately 1:05 a.m. on

12    January 30th.

13              Agent Dasso could be called as a

14    witness.  If he was, he would testify that on

15    December 11th of 1998, he was contacted by Sheriff

16    Steve Cundiff, also a member of the Black Hawk

17    Area Task Force.

18              Agent Dasso is present and would

19    testify to the same thing, and that is Mark Thomas

20    contacted Steve Cundiff on that date, December

21    11th, 1998, and told him he had spoken with Sammy

22    Walker, and that Walker had told him that Euka

23    Wadlington had been to the junk yard looking for

24    him and that Mr. Walker told him that he had big

25    trouble.

1          Agent Dasso would also testify that

2     Mr. Wadlington was in Clinton that morning, the

3     morning of his initial scheduled appearance in

4     Federal court, to be in court in Clinton, but he

5     had been released from court in Clinton at 10:30

6     in the morning, and his appearance in Federal

7     court was not until, I believe, 1:30 that

8     afternoon.

9          Agent Dasso would testify, and did

10    testify, I believe, in Chicago at a preliminary

11    hearing that Mark Thomas was an individual who

12    arranged through Mr. Wadlington to obtain a one

13    kilogram quantity of cocaine in November 1998, and

14    that Mr. Thomas had conversations that were

15    recorded with Mr. Wadlington, and that

16    Mr. Wadlington therefore knew Mr. Thomas was a

17    witness.

18          Agent Dasso would testify that on

19    January 5th, 1999, he had contact with Samuel

20    (inaudible) Miller, and on that occasion,

21    Mr. Miller told him that he had heard from

22    Terrance Hood's father that a threat had been

23    communicated to Mr. Miller's mother if he were to

24    cooperate with the police.  Mr. Miller indicated

25    he was scared because he thought they knew where

86

1       his mother lived in Chicago, meaning

2       Mr. Wadlington.  She's a school teacher there, and

3       the threat was that she may not make it safely

4       back home.

5                    That's all that --

6                    Oh, Mr. Miller indicated that other

7       people who were aware of -- who knew who

8       Mr. Wadlington was had received similar threats,

9       but he wasn't specific about that.  Mr. Miller

10      left the area of Clinton shortly after

11      January 5th, 1999.  There's a warrant out for his

12      arrest, and he can't be found.

13                   There's a Carrie Kirkenhoven

14      (phonetic) who works at the Best Western in

15      Clinton.  She would testify to the fact that six

16      to eight individuals, including Mr. Wadlington,

17      checked into the hotel prior to 7:30 p.m.; that

18      they got Room 400; that they charged movies and a

19      bar bill and telephone calls in a very short

20      period of time up to $57; that Mr. Goodman arrived

21      at 7:34 p.m.

22                   Prior to his arrival, a person who

23      described himself as Euka requested that if a

24      Mr. Goodman came to the front desk, she should

25      direct him to Room 400.  Mr. Goodman did arrive,

87

1    and she directed him accordingly; that when these

2    individuals checked out, they didn't formally

3    check out at the desk, they simply had a credit

4    card imprint they left, so when they checked out,

5    they just left without going through the formal

6    check-out process at the desk.

7                    That's what the Government's

8    evidence would be, Your Honor.

9                    THE COURT:  Mr. Goodman.

10                   MR. GOODMAN:  Thank you, Your Honor.

11                   First of all, there's certain things

12   that I'm not going to stipulate to.  I won't

13   stipulate that Mr. Greenwald would testify that

14   Euka was driving 65 miles an hour, because in his

15   report it says he paced him at 47.

16                   THE COURT:  (Inaudible) 47 miles an

17   hour.

18                   MR. GOODMAN:  But he says --

19                   THE COURT:  I don't have the report

20   in front of me.

21                   MR. GOODMAN:  I'm just --

22                   THE COURT:  I'm not asking you to

23   stipulate that's (inaudible) proffer.  I'm not

24   asking for you to.

25                   MR. GOODMAN:  I understand, Your

1   Honor, but I'm not going to stipulate that would

2   be his testimony, because his own report doesn't

3   say anything about driving at 65 miles an hour, so

4   I don't believe that would be his testimony if he

5   testified.

6              THE COURT:  Counsel, I just said

7   that.  I didn't hear Mr. Cronk say he drove 65

8   miles an hour.  I heard him say he was clocked at

9   47 miles per hour in a 35 miles per hour zone.

10             MR. GOODMAN:  I'm sorry.  Maybe I

11  misheard.

12             THE COURT:  I think you did.  But I

13  didn't hear anything about 65, and I don't care

14  whether it was 36 miles per hour or 65.

15             MR. GOODMAN:  All right, I

16  apologize.

17             Secondly, Your Honor, the

18  allegation -- well, just one correction.  Agent

19  Dasso, at the preliminary hearing, never did

20  testify about the names of any informants.  He

21  only testified Confidential Source No. 1 and

22  Confidential Source No. 2, and he did not disclose

23  the names of any confidential sources.

24             The third thing is, I'm not going

25  to -- I don't know if Your Honor is going to

1    consider the information about the threat to

2    Samuel Miller.  This is the very first I have

3    heard of it, and if Your Honor was going to

4    consider that, I would ask for testimony about it,

5    because it's not clear from what Mr. Cronk's

6    proffer -- well, first of all, it's not clear of

7    when this phone call occurred, it's not clear

8    whether the phone call came from Euka Wadlington

9    or whether it came from somebody else.

10                THE COURT:  I'm not disagreeing with

11   you (inaudible) take it for whatever value it has.

12                MR. GOODMAN:  Okay.  That's all I

13   have with regard to their -- I have some evidence

14   that I would proffer, Your Honor.

15                THE COURT:  Proceed.

16                MR. GOODMAN:  Thank you.

17                First, Your Honor, I believe it's --

18   Nicole Smith (phonetic), who is here in court, if

19   called to testify, she would testify that on

20   January 29th, 1999, she came to Davenport with

21   Euka Wadlington.  She accompanied him here.  She

22   would testify she is a friend of his.  She lives

23   in Chicago; that after court in Davenport, she

24   went to Clinton, Iowa, with Euka Wadlington.

25                They checked into a hotel.  She

1      would testify that at sometime between 7 and 8,

2      his attorney, being myself, arrived at the hotel

3      and had a conference with Euka Wadlington in the

4      hotel for approximately an hour, at which point

5      the attorney and Euka left the hotel and Euka

6      returned, she would testify, sometime between 10

7      and 11.  She's not sure of the exact time.

8                      At the time Euka returned,

9      Ms. Smith was in the pool, and when Euka arrived,

10     Euka said to her and to everyone else, "Come on.

11     It's time to go," at which point she dried herself

12     off, packed her stuff, including a wet bathing

13     suit, in a bag -- there were other people that had

14     wet clothes to pack.  They then packed up the car

15     and left.

16                     She would testify it was

17     approximately a half hour between the time that

18     Euka returned to the Best Western and the time

19     that they set off back for Chicago.  She would

20     testify that within about 10 minutes, they were

21     pulled over by a number of squad cars who -- she

22     would also testify Euka was not speeding.  She was

23     in the car with him.  She would testify about a

24     search that was not consensual, which I understand

25     is not an issue.  That would be her testimony.

1          And I would testify, Your Honor.  I

2    would proffer to the Court that Mr. Wadlington and

3    I had discussed -- prior to coming to Davenport to

4    court on the 29th, we had discussed using that

5    opportunity for a visit to Clinton, Iowa, which

6    is, in fact, the scene of the alleged crime, the

7    alleged drug offenses.  I had never been to

8    Clinton, Iowa.  We don't have the services of an

9    investigator on the case due to financial

10   considerations.

11         At this time -- and I had asked Euka

12   to show me around the town, and in particular show

13   me places that had some particular relevance to

14   what I knew about the allegations against him.  He

15   had agreed.  We had intended to go earlier in the

16   afternoon; however, earlier in the day, I had

17   learned that if I wanted to review the evidence, I

18   had to do it in the office of the United States

19   Attorney, and I spent approximately four hours in

20   Mr. Cronk's office looking through his file, which

21   was actually my first opportunity to look at the

22   evidence against my client.

23         At about, I believe it was 6 or 7, I

24   was kicked out of the office, politely, by Agent

25   Dasso, who told me he had to go home.  He gave me

92

1    directions to go back to Chicago.  I intended to

2    go straight back to Chicago; however, before I got

3    in the car and headed back to Chicago, I paged

4    Euka.  I figured he would have given up on me and

5    headed back to Chicago -- and by the way, Your

6    Honor, the only way I could reach him was by

7    pager, and I could not page him from the U.S.

8    Attorney's Office, and I had asked a clerk there

9    if I could take an incoming call or somebody told

10   me that was not possible there, so I had to wait

11   until I got in the car and paged him.

12            At that point, Euka told me he was

13   at the Best Western in Clinton and he's waiting

14   for me.  At that point, I said, "Okay.  I will

15   meet you."  I drove up to Clinton, met him at the

16   Best Western, spent approximately one hour in Room

17   400 with him discussing his case, at which time I

18   asked him to show me around the town of Clinton.

19   He did.  I don't know exactly how long we were

20   gone, but it was probably between 10 and 11 when I

21   dropped him back at the Best Western.

22            I then proceeded to drive back to

23   Chicago.  The next time I heard from my client was

24   at approximately 5 or 6 in the morning when he

25   paged me and told me what happened and that he had

1    gotten stopped by the police and they had been

2    following him, and I believe this is all we have,

3    Your Honor.

4                    THE COURT:  Any rebuttal, Mr. Cronk?

5                    MR. CRONK:  Agent Dasso kept track

6    of the time when Mr. Goodman was at the U.S.

7    Attorney's Office.  Incidentally, Mr. Goodman was

8    invited to come in anytime to the U.S. Attorney's

9    Office to view the file.  He had agreed to come

10   the week earlier, but then his schedule --

11                   THE COURT:  I'm not concerned about

12   that issue.  Whatever problems there were

13   (inaudible).  What's relevant is what went on

14   January 29th.

15                   MR. CRONK:  On January 29th, he left

16   the U.S. Attorney's Office an hour and a half --

17   hour and twenty-five minutes after it closed,

18   which was 6:25 p.m.  As I indicated, he arrived at

19   the Best Western in Clinton at 7:34 p.m.  That's

20   all.

21                   THE COURT:  (Inaudible).

22                   MR. CRONK:  Your Honor, the

23   conditions of release for the Defendant are set

24   forth in a bond.  This was a highly contested bond

25   hearing in Chicago.  These conditions, as the

94

1    Court has noted, was that he is not to leave the

2    Northern District of Iowa -- excuse me,

3    Illinois -- except to attend court business in

4    Davenport, Iowa.  He is responsible, he signed the

5    bond.  He is responsible for abiding by these

6    conditions.  He did not abide by those conditions,

7    so he has violated the conditions of release when

8    he left court at 2:15 in the afternoon.

9              We don't know where he was until

10   later in the evening, roughly 6:38, he made a

11   phone call from the Country Kitchen to a witness's

12   residence, a person who, I believe, the Court

13   could determine was scared to death of him from

14   her testimony and her demeanor on the witness

15   stand.  He had not had previous contact with her

16   for several months.  On that date, he was told to

17   have no contact with witnesses by Judge Wolle.

18             He was not with his lawyer, he

19   didn't come to the U.S. Attorney's Office with his

20   lawyer to review the file with his lawyer.  That

21   would have been -- my argument would be that would

22   have been the most appropriate thing for him to do

23   was to go to the U.S. Attorney's Office and sit

24   with him and go through the file with his

25   attorney, but he didn't do that.

95

1          He went with a group of six to eight

2     other individuals, apparently all from Chicago,

3     and drove to a restaurant and then to check into a

4     hotel.  He stayed there for four -- several hours.

5          By 7:35, Mr. Goodman, who states in

6     his Motion that he was not planning, when he left

7     the U.S. Attorney's Office, to meet at all with

8     Mr. Wadlington.  When he left the U.S. Attorney's

9     Office, his plan was to go back to Chicago and,

10    therefore, he did not intend at that point to meet

11    at all with Mr. Wadlington no matter where he was.

12    But when he contacted Mr. Wadlington,

13    Mr. Wadlington told him he was in Clinton and that

14    Mr. Goodman should come up there then.

15          Mr. Goodman, having already told

16    Mr. McClellan that the whole purpose of going to

17    Clinton was to see places and do things, then

18    changed his mind and decided maybe he should go to

19    Clinton after all.

20          When he got to Clinton, apparently

21    he met with his client for a period of time.

22    Agent Dasso, Officer Heeren, they found out about

23    Mr. Wadlington being at the Best Western sometime

24    shortly after 9 p.m., and they saw Mr. Wadlington

25    for the first time at 10:30 p.m. or thereabouts.

1    He was not with Mr. Goodman.  In fact, they did

2    not leave the Best Western until 10 minutes to

3    midnight, so Mr. Goodman had been gone for at

4    least an hour and a half or thereabouts before

5    Mr. Wadlington left the hotel.

6              And when he left, he left with a

7    group of individuals at a high rate of speed,

8    violating the traffic laws.  He was not authorized

9    to drive and was intending to drive from Clinton

10   to Illinois, even though he knew his license had

11   been revoked.

12             The pretrial services officer

13   provided credible testimony that this was not an

14   approved visit to Clinton.  It was not previously

15   discussed, it was not something that Mr. McClellan

16   was aware of until after the trip had been

17   completed, and he actually told the Court that

18   Mr. Goodman told him he did not know it was a

19   violation of his bond to be in Clinton.

20   Mr. McClellan indicated it was not his

21   understanding that Mr. Wadlington would be going

22   to Clinton by himself or with other individuals

23   for any other purpose except to visit with his

24   attorney and to do attorney-related matters.

25             Back in December of 1998,

1    Mr. Wadlington was supposed to be here in court at

2    1:30 in the afternoon.  He did not show up on

3    time.  His excuse was that he got lost.  The fact

4    is that he was looking for Mr. Thomas or for

5    information about Mr. Thomas.  Between the time he

6    was released from the Clinton courthouse on his

7    other case, he went to see Mr. Walker, then showed

8    up here some 20 minutes late.

9              And at that point, the Government

10   moved to revoke his bond and made it clear that if

11   there were any other violations of conditions of

12   release, we would move to revoke again.

13             I can't prove to you what all

14   Mr. Wadlington was doing in Clinton during the

15   several hours he wasn't supervised by his

16   attorney, nor should I have to prove that.

17   Certainly I know he had an improper attempt to

18   contact a witness -- I believe we've established

19   that -- after a District Court Judge told him not

20   to do that.  I can't prove what Mr. Wadlington

21   would have said to Heather Kline if she had been

22   home or if her mother had said Heather is such and

23   such a place; you can find her there.  I don't

24   know whether he would go there or not.  I

25   shouldn't have to prove that.

Case 3:98-cr-00242-SMR  Document 521  Filed 02/22/99  Page 98 of 117

98

1              There are travel restrictions on

2      witnesses for good reason.  The travel

3      restrictions in this case are clear.

4      Mr. Wadlington completely disregarded those

5      restrictions.  He thumbed his nose at the

6      magistrate who granted his release; he's thumbing

7      his nose at us now.

8              It is not appropriate for a person

9      with two prior felony drug convictions, with

10     serious drug offenses like this, to be allowed to

11     travel under the guise of meeting his lawyer

12     wherever his lawyer chooses to meet him and do as

13     he pleases, and I ask the Court to revoke his bond

14     because he's violated those conditions.

15              THE COURT:  Mr. Goodman?

16              MR. GOODMAN:  Your Honor, with all

17     due respect, I disagree that he has violated the

18     conditions of his bond.

19              I would say, first of all, there was

20     a contested bond hearing and the issue of bond is

21     very important to me and to my client.  It's very

22     important to me, and that's why it was so greatly

23     contested in Chicago.  It's important to me for a

24     number of reasons.

25              First of all, his liberty is

HERRING REPORTING SERVICES
319-355-0503          800-332-0503

1    important to me.  Second, it's important to me

2    because we're on a limited budget in this case,

3    and I need his assistance to help defend these

4    charges, and that is really the nature of these

5    proceedings.

6            It's an offense, apparently, to

7    Mr. Cronk that Mr. Wadlington has his liberty,

8    because Mr. Cronk believes his witnesses, who are

9    paid informants who are telling him that Euka is

10    the biggest drug dealer this side of the

11    Mississippi, and the fact that a judge in Chicago

12    didn't feel the same way is an affront to

13    Mr. Cronk, and I believe that's what we are here

14    about.

15            These allegations, first of all,

16    allegations that he has contacted witnesses.  The

17    first time he was informed by the Court -- and we

18    don't deny that Judge Wolle did tell

19    Mr. Wadlington as he left court that he was not to

20    have any contact with witnesses -- he did not know

21    Heather Kline was a witness at that time.  He had

22    absolutely no information to that respect.

23            Heather Kline is a person that has a

24    baby by him, and he contacted her, as he did in

25    the summer of 1998, to inquire about the baby, was

1    not calling her to see if she was going to be a

2    witness against him in his case.

3                    And there is certainly no evidence

4    of that, and the evidence they put on here, I

5    don't think, would even be to a suggest he was

6    trying to make some improper contact or he

7    believed she was a witness.

8                    The testimony about trying to

9    contact Mark Thomas was contradicted by

10   Mr. Cronk's own witness, who said that Euka never

11   asked where he was, never asked about trying to

12   contact the witness, himself may have brought up

13   the subject of Mark Thomas.  So the allegation of

14   contacting witnesses is a serious allegation, and

15   if there had been any threats, I certainly would

16   be the first one to admit that is a serious

17   matter, but it just has not been shown.  All we

18   have here are allegations.

19                   In terms of travel restrictions,

20   Mr. Cronk states that Mr. Wadlington has thumbed

21   his nose at the pretrial restrictions.  That is

22   certainly not true.  You heard Mr. McClellan say

23   Mr. Wadlington had been very diligent.  He has

24   been going to work, he's been working, he's been

25   supporting his family.  When he says he's going to

1    see his attorney, we also confirm that.  I also

2    call Mr. McClellan and say, "Yes.  He is coming to

3    see me.  Is that all right?"  On this day, I was

4    not able to get in touch with Mr. McClellan, and I

5    left him a voice mail explaining our intentions,

6    that I wanted Mr. Wadlington's assistance in the

7    town of Clinton.

8            Mr. Cronk says he shouldn't have

9    gone up there by himself; he should have gone to

10   the U.S. Attorney's Office.  But I don't believe

11   Mr. Cronk would have wanted Euka Wadlington in the

12   U.S. Attorney's Office with all of the evidence

13   and, in fact, Mr. Cronk asked whether Euka was

14   going to be there and specifically said that was

15   good he was not going to join us while I went

16   through the evidence in the case.

17           Finally, the fact that he was

18   traveling on his own, Mr. McClellan told you that

19   he was aware that Euka was not driving with me

20   that entire day and, in fact, I was somewhat

21   responsible he was left alone in Clinton for such

22   a long period of time, but as I explained to the

23   Court, I had no way to contact him from the time I

24   went to the U.S. Attorney's Office and saw these

25   huge stacks of evidence that I wanted to go

1    through, and I probably should have been more

2    diligent at that point and contacted Euka and told

3    him, "It's probably going to be too late.  You

4    should go on back to Chicago," and that's my fault

5    and I should have done that, and I didn't.

6              I just went to the U.S. Attorney's

7    Office (inaudible) going to head back to Chicago,

8    and after I got out and learned he was up in

9    Clinton, I changed my plans as Mr. Cronk states,

10   but his trying to assign some sort of sneaky

11   motive for me going up there is not true.  I went

12   up there for the reason that I had told Sean

13   McClellan I was going up there, to investigate my

14   case and to investigate Euka's case and to enlist

15   his assistance.

16             I believe that those are the two

17   matters before you, the contacting witnesses and

18   the travel restrictions.  If I've missed one --

19   oh, violating other laws, where the traffic

20   restriction, I believe, the Court said you were

21   not particularly concerned with whether he was

22   speeding and whether or not he had a beer at the

23   Best Western or whether or not he socialized, but

24   if he has four our five hours to wait for me and

25   doesn't know when I'm going to arrive and when

1    he's going to hear from me, I don't think it's

2    wrong for him to go to a restaurant and have a

3    meal and for him to socialize with his friends or

4    even have a beer.  It is not a condition of his

5    bond.  He certainly is not allowed to get drunk

6    and as (inaudible) andadmits, he was not drunk,

7    and I don't believe there is any evidence of a

8    bond violation, and I would ask the Court to deny

9    the Government's Motion.

10                   THE COURT:  Mr. Cronk.

11                   MR. CRONK:  Thank you.

12                   According to electronic monitoring,

13   at 3:12 a.m. on January 29th, Mr. Wadlington was

14   no longer at home.  He wasn't going to work.  But

15   he didn't return home until January 30th at 5:07

16   a.m.

17                   His hearing in Davenport was at

18   noon.  He was excused from the courthouse at about

19   2 o'clock.  There's been no reasonable explanation

20   given as to why Mr. Wadlington traveled to Clinton

21   with six to eight other people or five to seven

22   other people from Chicago.  There's been no

23   reasonable explanation for that.  This was not

24   supposed to be a trip to go to the hotel, drink,

25   watch movies and go swimming.

104

1    If Mr. Wadlington doesn't have

2    driving privileges, I understand why one person

3    would have to drive him, even if Mr. Goodman isn't

4    that person.  There's no reasonable explanation

5    for why a large group of people would go.  It

6    completely defies these conditions of release that

7    Mr. Wadlington or Mr. Goodman would think it

8    appropriate for a person on these kind of strict

9    travel restrictions to travel with an entourage

10   of individuals, go to Clinton, a place he's not

11   supposed to go, which is clearly written in the

12   travel restrictions, check into a hotel, call

13   witnesses, call other people, call anybody.  He's

14   not supposed to call anybody while he's there.

15   He's supposed to be with his lawyer.

16            That's all, Your Honor.

17            THE COURT:  As I have listened to

18   the evidence and the arguments, I have weighed the

19   equities and I have weighed the issues, and in my

20   own mind, I have flip-flopped several times as to

21   what I'm going to do.  As I listened to the

22   evidence, there are some things that bother me.

23            First of all, what bothers me is

24   there is nothing in the record before me that

25   shows who the witnesses are Mr. Waldlington's not

1    supposed to contact.  All I've heard and

2    everyone's agreed is that (inaudible) said don't

3    contact witnesses, but I don't know who those

4    witnesses are.  That aspect troubles me.

5              Mr. Walker's testimony was

6    (inaudible) as far as what went on, and I

7    certainly -- since I don't know either witness --

8    he didn't say he was threatened.  That issue,

9    while on its face, in court Mr. Goodman concedes

10   contact with witness or, even worse, threatening

11   witnesses, is a serious matter.

12             Right now, I haven't (inaudible),

13   but what really bothers me, Mr. Goodman, is I have

14   looked at Magistrate Judge Denlow's order, and I

15   don't see anything in here that says

16   Mr. Wadlington is permitted to go anywhere other

17   than Northern District of Illinois or Davenport,

18   Iowa (inaudible).  It doesn't say anything in

19   there about being in the company of his attorney

20   and that company being allowed (inaudible).

21             At the outset, my feeling was that

22   there was a good argument to be made, because he

23   was consulting with you and going to assist you

24   and admittedly, according to Mr. McClellan, you

25   called his office the day before and left a voice

1    mail and said we're going to (inaudible), but

2    again, that's not part of the bond.  You were

3    (inaudible) there hasn't been any application.

4               I might have been more lenient in

5    this regard had Mr. Wadlington simply accompanied

6    you to Clinton then accompanied you back to

7    Chicago, or at least in that time frame; but what

8    really bothers me is:  number one, according to

9    Mr. Walker, even though his testimony is

10   (inaudible) apparently after Magistrate Judge

11   Denlow issued this bond on December 2, 1998,

12   Mr. Wadlington (inaudible).  I understand and I

13   recall that that hearing, the original hearing,

14   was a matter of (inaudible).

15              MR. GOODMAN:  Because he was there

16   for that matter on that day.

17              THE COURT:  And I'll accept your

18   professional statement, but again, that's not part

19   of the bond.  There's nothing in there.  And

20   talking to Mr. Walker had nothing to do with

21   handling that matter in Clinton, Iowa, on

22   December 11th.

23              Further, I am troubled by the fact

24   that the evidence shows Mr. Walker -- I'm sorry.

25   Mr. Wadlington left Chicago at 3 o'clock in the

1    morning on January 29th, 1999, to come to

2    Davenport, Iowa, for a (inaudible) hearing.  I've

3    driven to Chicago hundreds of times, and the Court

4    will take judicial notice (inaudible)

5    approximately nine hours to get here.  That's

6    inexplicable to me.

7                  Also, I'm troubled by the fact,

8    Mr. Goodman, as your argument notes the whole

9    basis for the (inaudible) to Clinton was to assist

10   Counsel, yet, as you can see, Mr. Wadlington

11   wasn't with you when you were reviewing all the

12   evidence here in the Quad Cities.  That may or may

13   not be a tactical decision on your part to have

14   your client review the evidence, but certainly as

15   you know, as Mr. Cronk knows, as the Court knows,

16   Mr. Wadlington had every opportunity and every

17   right to be in the U.S. Attorney's Office with you

18   to review evidence.  Again, that may be your

19   tactical decision.  I'm only commenting on what

20   the evidence demonstrates.  But it's a little

21   incongruous or little disingenuous to me to

22   suggest that you are reviewing documents here and

23   you want Mr. Wadlington's assistance so you can go

24   to Clinton, yet the two of you are apart for some

25   apparently five or six hours.  Again, I find that

1    difficult to explain.

2                    And further, what I guess is really

3    where I perhaps focused, is that as his attorney,

4    Mr. Goodman -- because you have really put

5    yourself on the line here with your professional

6    statement -- you of all people would be in a

7    position to tell Mr. Wadlington if you're

8    reviewing the documents what he should do, was he

9    to stay with you or whether he was to return to

10   Chicago.  I heard no evidence that suggests that

11   you told him to do anything.  So apparently he

12   knew on his own to go to Clinton, because that's

13   what he did.

14                   You indicated you had no way of

15   contacting him.  You told the Court as soon as you

16   got out of the U.S. Attorney's Office, you paged

17   him and he called you back on the car phone.  So

18   there was ample opportunity, it appears to me, for

19   you to have been in contact with Mr. Wadlington

20   during that three- or four-hour period when you

21   were reviewing the volumes of evidence or

22   discovery that was being turned over.

23                   The bottom line is, I'm troubled

24   because I'm concerned, Mr. Goodman, that a lot of

25   this is turning on what you have apparently

1    advised your client or (inaudible) facilitation.

2    I'm troubled by that.  Because I don't find

3    anywhere in here that even in your company

4    Mr. Wadlington is supposed to be outside of

5    Davenport, Iowa, or the Northern District of

6    Illinois or I'll assume the most direct route back

7    to the Northern District of Illinois.

8               I've made it clear (inaudible) that

9    I wasn't interested and I wasn't interested in the

10   nature of the stop itself and what it produced,

11   and yet I do have to comment and agree with

12   Mr. Cronk I'm also somewhat concerned and a bit

13   mystified why it would take seven or eight people

14   to accompany Mr. Wadlington to a hearing in Iowa,

15   and I'm going to assume that some or all the

16   people, since he can't drive and has conceded

17   (inaudible) Chicago perhaps sometime around 3 or

18   3:15 a.m. that (inaudible).

19               Just a lot doesn't make sense here.

20   And to argue that his presence in Clinton, Iowa,

21   is not a violation of bond, I think, flies in the

22   face of the bond itself.

23               I'm not satisfied there's been any

24   evidence to show there's been an attempt by

25   Mr. Wadlington to interfere with witnesses,

1    because again, that's not before the Court

2    (inaudible), but I'm satisfied that upon one

3    occasion, Mr. Wadlington has found it necessary on

4    his own to violate the terms of the bond, to go to

5    Clinton, Iowa, where this incident is alleged to

6    have occurred that everyone has recited to me, and

7    yet that seems to be (inaudible) and apparently on

8    at least one occasion, as I understand it,

9    certainly facilitated by (inaudible), which

10   troubles me.

11              I think there's some things that

12   could have been done in advance, should have been

13   done in advance to handle it, so I'm not satisfied

14   that the trip to Clinton was solely for the

15   purpose of assisting Counsel under the

16   circumstances.

17              I am also not satisfied each and

18   every instance when Mr. Wadlington has been in

19   Clinton since December 2, 1998, was appropriate.

20   Certainly it was in violation of his bond, and for

21   those reasons I am going to revoke the pretrial

22   release.

23              MR. GOODMAN:  Your Honor, may I make

24   a comment?

25              THE COURT:  You may.

1       MR. GOODMAN:  First of all, I would

2   ask the Court to perhaps before -- I would ask the

3   Court to reconsider and perhaps look at the

4   transcript of the bond hearing, because in that

5   transcript you will see that Judge Denlow

6   specifically instructs the Defendant that one of

7   the conditions of his bond is to take care of the

8   state charges out of Clinton, Iowa.

9       And for your information, those

10  state charges are the exact same charges as count

11  whatever -- five -- of this indictment.  He's

12  actually being tried in two jurisdictions for a

13  single alleged sale of cocaine that occurred in

14  December of 1996, in Clinton.  He's had to hire

15  two attorneys -- an Iowa attorney, and he hired me

16  because he was arrested in Chicago -- to combat

17  those charges.  His parents have had to pay a

18  great -- their entire pension to pay for attorneys

19  and now to pay for the attorney for his brother,

20  who has now been indicted -- and I believe I'm not

21  going to speak to the legitimacy of the charges

22  against the brother -- and that is another strain

23  on the family and another reason why it is so

24  important for me to have my client out so that we

25  can prepare a defense, and I don't believe I can

112

1    defend these charges without him, without his

2    assistance.

3                    And I would say if you look at the

4    transcript of that bond hearing, he was

5    specifically directed to take care of that matter

6    in Clinton.  The only times he's been in Clinton

7    are when he went there to go to court in December

8    prior to coming to Davenport and he would also --

9    that is the time he had a court appearance in

10   Clinton and the Government concedes that he had a

11   court appearance.  He was released from that court

12   appearance at 10:30.  He had a 1:30 or some such a

13   date in Davenport, Iowa.

14                   On his way, he apparently saw this

15   man, Sammy Walker, and there are some

16   circumstances we didn't get into as to why the car

17   broke down; there are some circumstances as to why

18   he ended up at that junk yard.  He was not there

19   looking for Mark Thomas, and there was no evidence

20   he was.  He had some time to kill between coming

21   to Clinton and coming to Davenport, Iowa, and

22   there was no evidence that he used that time

23   illegally or he had violated bond, but he

24   certainly had to drive from Clinton to Davenport

25   to get to court here.

113

1    The only other time he's been in

2    Clinton, it's my understanding, and at my

3    direction to help me investigate the case, and

4    Your Honor is correct that I should have been more

5    clear with him and said, "You can't go sit there

6    and hang out waiting for me," but the fact is I

7    thought I was going to Mr. Cronk's office for a

8    20-, 30-minute meeting.  I didn't realize I was

9    going to be there for four or five hours.  Yes, I

10   should have left and called him and made some

11   arrangements, but I just didn't and that was my

12   poor judgment.  I figured that Euka was just going

13   to go back, get in his car and go home.

14        And as far as I'm conflicted in

15   this, I feel responsible, but I just don't feel

16   there has to be some intentional violation of bond

17   conditions, and I don't believe they have shown

18   it, and I respect this Court's decision, but I

19   would ask you to reconsider, considering the

20   gravity of this situation and --

21        THE COURT:  I have considered the

22   gravity, Mr. Goodman, and I would note, number

23   one, I'm also available to (inaudible) on a proper

24   motion.  You're asking to reconsider on a

25   transcript that, number one, isn't in evidence in

114

1    this matter and, number two, I suspect isn't even

2    available for me right now to review; is that

3    correct?

4                    MR. GOODMAN:  That's correct, Your

5    Honor.  I have never ordered up the transcript of

6    the bond, but I certainly would be prepared to do

7    so at our expense.

8                    THE COURT:  I think if that's what

9    you want, you're going to have to do that.  As I

10   said, I am willing and I am prepared to reconsider

11   on proper evidence.

12                   But based on the evidence before me

13   now, and I think that to paraphrase again, to

14   characterize what transpired at this original

15   detention hearing is unfair, at least to this

16   Court, because I have no idea.  Maybe (inaudible)

17   take care of the Iowa charges and I suspect he

18   might.  It certainly could have been (inaudible).

19   You were there at the hearing, I presume.  There's

20   nothing in this file that tells me what

21   Mr. Wadlington was supposed to do about the Iowa

22   charges other than remaining in Northern District

23   of Illinois or travel to Davenport, Iowa.

24                   Now, that said, the transcript

25   (inaudible) but I would also take exception to the

1   (inaudible) at Clinton at any time for anything

2   other than to handle matters which are still now

3   kind of out in hyperspace, because this Court has

4   nothing before it on the record.  But as I'm sure

5   you're familiar with the term trespass ob initio

6   (phonetic), I think in this case Mr. Wadlington

7   may well -- and conceding may well have been in

8   Clinton on (inaudible) in 1998 for legitimate

9   purposes of handling a criminal matter, but I can

10   tell you that based upon Mr. Walker's testimony,

11   which I have already characterized as being

12   (inaudible), I also know that based on that,

13   that's far beyond handling the criminal matter.

14           In that regard, I don't find

15   (inaudible) in Clinton to be proper or

16   appropriate, and I don't find the circumstances

17   and conduct on January 29th and January 30th, at

18   least as before me on this record, appropriate,

19   and that's the reason I found a violation of the

20   bond.  I think there's some serious issues raised

21   here.  I think there's some serious issues that

22   are raised as to whether the Defendant is, in

23   fact, adhering to his bond, and that's exactly why

24   I've ordered it revoked.

25           And you're free, pursuant to Rules

116

1    of Criminal Procedure to move to reconsider.   I

2    will consider that on the proper evidence.   You're

3    also free to (inaudible) and you do that

4    (inaudible).

5                      Is there anything further we need to

6    discuss at this time?

7                      MR. CRONK:   Nothing from the

8    Government.

9                      THE COURT:   We will be in recess,

10   and the Defendant will remain in custody of the

11   U.S. Marshall's Service.

12                     (The hearing was concluded at

13   1:05 p.m., February 12, 1999.)

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Beverly K. Bleigh, a Certified Shorthand

4     Reporter in and for the State of Iowa, hereby

5     certify that I transcribed from audiotape the

6     proceedings in the trial; and that the above and

7     foregoing computer-aided transcript is a full,

8     true and complete translation and transcript of

9     the evidence recorded on audiotape at the trial,

10    and contains the full, true and complete report of

11    the evidence offered or introduced, all objections

12    of counsel, all rulings of the Court, to the best

13    of my ability from the audiotape.

14

15          Dated this 22nd day of February, 1999.

16

17

18

19                    *Beverly K. Bleigh*

20          _____

                Beverly K. Bleigh
21              Certified Shorthand Reporter
                Alpine Centre - 295 North
22              2435 East Kimberly Road
                Bettendorf, Iowa  52722-3500
23

24

25